*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2004 FED App. 0179P (6th Cir.)
File Name: 04a0179p.06

# UNITED STATES COURT OF APPEALS

### FOR THE SIXTH CIRCUIT

───────────

LIONEL Z. GLANCY, on behalf
of himself and all others
similarly situated,
    *Plaintiff-Appellant,*

    *v.*

TAUBMAN CENTERS, INC.;
ROBERT S. TAUBMAN; LISA A.
PAYNE; GRAHAM T. ALLISON;
PETER KARMANOS, JR.;
WILLIAM S. TAUBMAN;
ALLAN J. BLOOSTEIN; JEROME
A. CHAZEN; S. PARKER
GILBERT,
    *Defendants-Appellees.*

No. 03-1609

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 02-75120—Victoria A. Roberts, District Judge.

Argued: October 28, 2003

Decided and Filed: June 16, 2004

Before: RYAN, MOORE, and ROGERS, Circuit Judges.

───────────

───────────

### COUNSEL

**ARGUED:** Steven G. Schulman, MILBERG, WEISS, BERSHAD & SCHULMAN, New York, New York, for Appellant. Matthew F. Leitman, MIRO, WEINER & KRAMER, Bloomfield Hills, Michigan, for Appellees. **ON BRIEF:** Steven G. Schulman, MILBERG, WEISS, BERSHAD & SCHULMAN, New York, New York, Marc L. Newman, MILLER & SHEA, Troy, Michigan, for Appellant. Matthew F. Leitman, Joseph Aviv, Bruce L. Segal, MIRO, WEINER & KRAMER, Bloomfield Hills, Michigan, I. W. Winsten, Raymond W. Henney, HONIGMAN, MILLER, SCHWARTZ & COHN, Detroit, Michigan, for Appellees.

    MOORE, J., delivered the opinion of the court. ROGERS, J. (p. 36), delivered a separate opinion concurring in the judgment and in Judge Moore's opinion, except as to part II.C.2. RYAN, J. (pp. 37-39), delivered a separate opinion concurring in part and dissenting in part.

───────────

### OPINION

───────────

    KAREN NELSON MOORE, Circuit Judge. Litigation stemming from the attempted, but failed, takeover of Defendant-Appellee Taubman Centers, Inc. ("TCI") by Simon Property Group, Inc. ("SPG") gives rise to this appeal. Plaintiff-Appellant Lionel Z. Glancy ("Glancy"), a California citizen, filed an action, containing class and shareholder-derivative claims, against Defendants-Appellees TCI and various members of the TCI Board of Directors ("TCI Board" or "Board"), alleging that TCI's opposition to SPG's tender offer was a breach of the fiduciary duties of the TCI Board. The district court dismissed the action, ruling that because complete diversity of parties did not exist the district court did

not have subject matter jurisdiction over the case. The district court reached this conclusion because it ruled that an absent partnership, which owned a sizeable portion of TCI shares, had an interest in the litigation that would be impeded or impaired by a disposition in its absence but could not be joined as a defendant because two general partners were citizens of the same state as plaintiff Glancy. On appeal, the question is whether that absentee partnership is an indispensable party pursuant to Federal Rule of Civil Procedure 19(b) such that the action must be dismissed rather than proceed in the partnership's absence. For the following reasons, we **VACATE** the district court's judgment and **REMAND** the case back to the district court for further proceedings.

## I. BACKGROUND

As an initial caveat, we note that the following rendition of facts is based upon our reading of the documents compiled by the parties at an early stage of the litigation. The district court upon remand may receive additional factual and evidentiary materials that may appropriately lead to different factual conclusions. The organization of TCI, its affiliated partnerships, and the enterprises of the Taubman family is complex and laden with acronyms. TCI is a publicly traded corporation that was incorporated in Michigan in 1973 and that has its principal place of business in Michigan. TCI is organized as a corporate Real Estate Investment Trust ("REIT"), which is "a legal entity that holds real estate interests and, through its payment of dividends, is able to reduce or avoid incurring Federal income tax at the corporate level, allowing shareholders to participate in real estate investments without the double taxation of income . . . ." Joint Appendix ("J.A.") at 512 (TCI Initial Public Offering Prospectus, 11/20/92). TCI's sole asset is a partial ownership stake in Taubman Realty Group Limited Partnership ("TRG"), which owns, operates, manages, leases, and develops shopping centers around the country. A. Alfred Taubman, along with several members of his family, formed

TRG in 1985, to consolidate their various shopping center interests in a single partnership. Interests in TRG were parceled out in "units." The Taubman family controlled a share of these units, but about 50% of TRG's units were controlled by several pension trusts owned by General Motors ("GM Trusts"). J.A. at 512.

In late 1991, TRG began a restructuring so that it could develop from a limited financial arrangement into a more expansive operating business. TG Partners Limited Partnership ("TG Partners") was formed as a partnership separate from TRG, and it owned 5.2% of TRG's units. J.A. at 513, 517. TCI announced an initial public offering, selling 26.8 million shares to the public and offering an additional 13.6 million shares to the GM Trusts and the AT&T Trust, so that when added to a residual number of shares held by the Taubman Group (which included the Taubman family members and TG Partners), approximately 40.7 million shares would be outstanding after the offering. J.A. at 516. Following the reconfiguration, TCI owned 32.8% of TRG's units.[1] J.A. at 517. The 26.8 million shares of TCI offered to the public represented a 65.9% ownership stake in TCI, such that the purchasers of the publicly available TCI stock controlled 21.6% of TRG's units even though TCI as a whole controlled 32.8% of TRG's units.[2] J.A. at 517. Alfred

---

[1] After the restructuring, the GM Trusts controlled 44.0% of TRG's units and the "Taubman Group," which included various members of the Taubman family (Alfred A. Taubman, Robert Taubman, William Taubman, and Gayle Taubman Kalisman) and TG Partners Limited Partnership ("TG Partners"), controlled 22.9% of TRG's units (TG Partners controlled 5.2% of TRG's units, the remainder of the Taubman group controlled 17.7% of TRG's units). Joint Appendix ("J.A.") at 517 (TCI Initial Public Offering Prospectus, 11/20/92).

[2] The GM Trusts owned 19.8% of TCI's outstanding shares, the AT&T Trust controlled 13.7%, and the Taubman Group controlled a 0.6% stake. J.A. at 517. The combination of the GM Trusts' holdings of TCI shares and their control of 44.0% of TRG's units left them with direct and indirect ownership of 50.5% of TRG's units.

Taubman's sons, Robert and William, form the upper management of both TCI and TRG: Robert is the Chairman, President, and Chief Executive Officer of TCI, as well as the President and Chief Executive Officer of TRG, while William is the Executive Vice-President of both TCI and TRG.

In 1998, TCI and TRG again restructured, partially to accommodate GM's desire to withdraw from the previous arrangement. Upon GM's withdrawal, TCI's unit ownership in TRG would have increased from approximately 39% to approximately 63%. J.A. at 435 (TCI Bd. of Dirs. Meeting Minutes, 08/17/98). Consequently, TRG's then minority unit holders, in particular the Taubman Family (Alfred A. Taubman, Robert Taubman, William Taubman, and Gayle Taubman Kalisman) and TG Partners, would have less control over the management of TRG's assets. The result was the increased likelihood that a potential acquirer could gain a controlling interest in TRG by acquiring TCI stock. To counter this threat, the TCI Board in 1998 issued a new class of preferred TCI stock — the Series B Preferred Stock ("Series B") — to the remaining partners of TRG in order to give them increased control over TCI and thus increased control over TRG. *See* J.A. at 414, 416 (Restated TCI Articles of Incorp. at 10) (stating that TCI "will initially issue the Series B Preferred Stock to each Person who, on the initial date of issuance, is a Registered Unitholder at the rate of one share for each Unit held by such Registered Unitholder," and defining "Registered Unitholder" as "a Person, other than the Corporation [] who . . . is reflected in the records of [TRG] as a partner in [TRG]"). TCI distributed nearly 32 million Series B shares for $.001 per share, or an extremely low total price of $38,400. J.A. at 193-94 (Keath Decl.); J.A. at 168 (Bebchuk Decl.). Each Series B share gave its holder the same voting rights as those attached to the preexisting 53 million common shares. J.A. at 193 (Keath Decl.).

The influx of the Series B preferred TCI shares had its desired effect and diluted the voting power of TCI's common shareholders. After 1992, approximately 99% of TCI's stock,

which then was all common stock, was controlled by shareholders (including GM and AT&T) other than the Taubman family. J.A. at 517 (TCI Initial Public Offering Prospectus, 11/20/92). After 1998, non-Taubman family control of TCI's total outstanding shares decreased to approximately 62.8%. J.A. at 193 (Keath Decl.). This number is highly significant, because TCI's Articles of Incorporation required a two-thirds-of-shareholders vote to approve a merger or alter the Articles of Incorporation. Thus, the 1998 issuance of Series B preferred shares insulated TCI, and thus TRG, from a takeover attempt, particularly in light of the Ownership Limit Provision of TCI's Articles of Incorporation, which prohibited any entity from owning more than 8.23% of the value of TCI's total outstanding capital stock. J.A. at 421 (TCI Restated Art. of Incorp.); J.A. at 591 (TCI Initial Public Offering Prospectus, 11/20/92). This provision could not be removed without a two-thirds vote, so a potential acquirer had to purchase over 66.6% of TCI's outstanding shares (including Series B shares) in order to effectuate a takeover. J.A. at 591.

Taubman family members, and the various entities controlled by Taubman family members, owned over twenty-four million Series B shares, or 76.6% of all the Series B shares distributed.[3] J.A. at 472 (Poissant Decl.). These twenty-four million Series B shares account for 28.3% of the total outstanding TCI shares. The Taubman family controls its Series B shares through a series of entities, including TG Partners, which plays a critical role in this case. TG Partners is a limited partnership formed under the laws of Delaware. It owns 21% of the Series B stock (approximately 6.3 million shares and about 6% of all outstanding TCI shares). The general partners of TG Partners include two general partners who are California citizens (Avner Naggar and Sidney R. Unobskey). J.A. at 473-74 (Poissant Decl.). Another general

---

[3] 7.43 million TCI Series B shares were distributed to other TRG Unit Holders. J.A. at 473 (Poissant Decl.).

partner of TG Partners is a separate partnership formed under the laws of Michigan, Taubman Realty Ventures ("TRV"), whose partners are Taubman family members (Alfred, Robert, William, and Alfred's daughter, Gayle Taubman Kalisman). Alfred Taubman, as trustee of the A. Alfred Taubman Revocable Trust, is the managing general partner of TRV and votes the Series B shares owned by TRV. The managing general partner of TG Partners is a Michigan corporation, TG Michigan, Inc., *see* J.A. at 474; J.A. at 806 (TRG P'ship Agreement), whose sole shareholder is Alfred Taubman, acting through a revocable trust. It is alleged that Alfred Taubman votes TG Partners's Series B stock. *See* J.A. at 474 (Poissant Decl.).

The bulk of the Taubman family's Series B shares are owned through other partnerships. Alfred Taubman votes the Series B shares of TRA Partners, a Michigan partnership that owns almost 17.7 million (or 56%) of the outstanding Series B shares. Two other Alfred Taubman-controlled entities, Taub-Co Management, Inc., and the A. Alfred Taubman Trust, own almost 12,000 shares combined. The other members of the Taubman family also own in their individual capacities relatively minimal quantities of shares.[4]

On October 16, 2002, SPG, said to be the largest retail-shopping-mall REIT in the United States, initiated communication with Robert Taubman in hopes of purchasing all the publicly traded TCI stock. Robert Taubman declined even to discuss the issue, and SPG responded by outlining an offer to purchase all outstanding TCI shares for $17.50 a share. The TCI Board of Directors rejected the offer on October 28, 2002, prompting SPG to announce a public tender offer to purchase all of TCI's outstanding common stock for $18.00 a share on December 5, 2002. SPG's offer was conditioned upon the removal of the Ownership Limit

---

[4]Robert Taubman, William Taubman, and Gayle Taubman Kalisman each own 5,925 Series B shares.

Provision, and accordingly SPG needed to acquire at least two-thirds of the outstanding shares to alter TCI's Articles of Incorporation. On December 10, 2002, the TCI Board met with its financial advisors and rejected the offer. Eventually, SPG joined with Westfield America ("Westfield"), an Australian real-estate corporation, and increased the offer to $20 a share. The TCI Board again rejected the offer, but many shareholders tendered their shares. SPG announced on February 17, 2003, that 84.5% of the common shares of TCI had been tendered, which amounted to only 52% of the total outstanding shares. SPG thus had failed to obtain the requisite two-thirds ownership needed to abolish the Ownership Limit Provision.

SPG filed an action in the United States District Court for the Eastern District of Michigan against TCI, alleging that the issuance of the Series B shares constituted a "control share acquisition," which was at the time illegal under Michigan law. SPG sought an injunction against the voting of the Series B shares. After receiving a favorable judgment in the district court, and even fully briefing a response to TCI's appeal in this court, No. 03-1610 (6th Cir. 2003), SPG withdrew its tender offer on October 8, 2003, and the parties stipulated to the dismissal of the appeal on October 15, 2003, because of intervening Michigan state legislation that overturned the ruling of the district court.[5]

---

[5]On September 18, 2003, the Michigan Legislature passed Public Act No. 181, which amended the Michigan Control Share Acquisition statute, Mich. Comp. Laws § 450.1791, to provide that "the formation of a group does not constitute a control share acquisition of shares of an issuing public corporation held by members of the group." 2003 Mich. Pub. Acts 181. The act also added section 798a, which insured the act's retroactive effect so that it covered the Taubman case: "Shares without voting rights because the formation of a group after April 1, 1988 was deemed to be a control share acquisition shall have the same voting rights as were accorded the shares before the formation of the group." *Id.* The Governor of Michigan signed the bill into law on October 7, 2003. *See When Battles Commence*, Economist, Feb. 21, 2004, at 67; Dean Starkman & Robin Sidel, *Simon, Westfield Drop Taubman Bid*, Wall St.

Glancy, a California citizen and a TCI shareholder, filed an action in the U.S. District Court for the Eastern District of Michigan both as a representative of a class of TCI shareholders and as a shareholder derivatively on behalf of TCI on December 24, 2002. He later amended the complaint with the permission of the district court on January 31, 2003. At the heart of the complaint is the charge that the TCI Board members "abus[ed] their fiduciary positions of control over [TCI] to thwart any legitimate attempts or interest to acquire [TCI] for a substantial premium." J.A. at 264 (Am. Compl.). Glancy states that his claims arise under Michigan law, J.A. at 297, and both sides agree that Michigan law applies.

Glancy's amended complaint seeks various kinds of relief. In Counts III-VI, Glancy presents class and derivative claims against the TCI Board for various breaches of fiduciary duties. J.A. at 297-306 (Am. Compl.). In Count VII, Glancy asks the court to order the TCI Board defendants to cooperate with any entity "proposing any transaction which would maximize shareholder value," J.A. at 308; to declare that the TCI Board members violated their fiduciary duties; and to enjoin the TCI Board members from "entrenching themselves in office." J.A. at 308. Most significantly, in Counts I-II, Glancy seeks the invalidation of the Series B shares. Glancy's Amended Complaint reads: "[P]laintiff seeks . . . a declaration that the Taubman family's Series B Preferred Stock does not have any voting rights . . .," J.A. at 295, and "[P]laintiff seeks a declaration that the Taubman family may not validly vote the Series B Preferred Stock under circumstances that would have the effect of foreclosing the [SPG] tender offer . . . ." J.A. at 297. Glancy names as

---

J., Oct. 9, 2003, at C5. SPG abandoned its tender offer the following day, and TCI dropped its appeal a week later. By overturning the district court's decision and altering the text of the statute that TCI allegedly violated so as to absolve it from liability, the Michigan legislature effectively ended any chance of SPG either completing the acquisition or winning its case.

defendants TCI and the TCI Board members,[6] but does not name as parties Alfred Taubman, TG Partners, or any of the other Taubman-controlled partnerships.

TCI did not file a motion pursuant to Federal Rule of Civil Procedure 12(b)(1) alleging lack of subject matter jurisdiction or a Rule 12(b)(7) motion alleging failure to join a party pursuant to the joinder provisions of Rule 19. Rather, TCI raised the issue of joinder and lack of subject matter jurisdiction in its brief in opposition to Glancy's motion for a preliminary injunction. *See* J.A. at 349-51. Rule 12(h) permits a defense based on lack of subject matter jurisdiction to be raised in a motion other than a Rule 12(b)(1) motion. Fed. R. Civ. P. 12(h)(3).

The district court issued an Opinion and Order on May 1, 2003. The district court then issued an Amended Opinion and Order on May 8, 2003, which superseded the previous order, but did not differ substantially. The district court addressed TCI's contention that subject matter jurisdiction was lacking because Glancy did not satisfy the diversity or amount-in-controversy requirements. The district court held that because TG Partners was a real party in interest, given its ownership of six million shares of Series B stock that the district court's ruling could invalidate, TG Partners's citizenship, and the citizenship of its constituent partners, had to be considered for diversity purposes. Because Plaintiff Glancy was a citizen of California as were two general partners of TG Partners, complete diversity did not exist between plaintiff and the proper defendants. The district court thus dismissed Glancy's suit, but did not rule on the amount-in-controversy issue. Glancy timely filed his notice of appeal. We have appellate

---

[6]None of the TCI Board defendants are from California. The TCI Board defendants are: Robert S. Taubman (Michigan), William S. Taubman (Michigan); Lisa A. Payne (Michigan); Graham T. Allison (Massachusetts); Peter Karmanos, Jr. (Michigan); Allan J. Bloostein (Connecticut); Jerome A. Chazen (New York); and S. Parker Gilbert (New York).

jurisdiction over the district court's order of dismissal pursuant to 28 U.S.C. § 1291.

## II. ANALYSIS

Before delving into the depths of the Federal Rules of Civil Procedure's joinder provisions, we must pause to comprehend fully what precisely Glancy seeks from his litigation. As Glancy argues, "the plaintiff is the master of the complaint." *Holmes Group, Inc. v. Vornado Air Circulation Sys., Inc.*, 535 U.S. 826, 831 (2002) (quotation omitted). The benefits of that stewardship are often accompanied by jurisdiction-related pitfalls, as is the case here. The central problem is an incongruence between the defendants named by Glancy and the relief he seeks. Glancy named only TCI and the TCI Board as defendants, but part of the relief he seeks — the invalidation of the Series B shares — potentially impacts the interests of more than just those named defendants.

There is little doubt that Glancy's complaint seeks comprehensive relief that entails the invalidation of all the Series B shares owned by the network of partnerships controlled by the Taubman family. In his amended complaint, Glancy states that "the *Taubman defendants . . .* improperly gave themselves a blocking voting position against unsolicited takeovers," J.A. at 264 (Am. Compl.) (emphasis added), by "providing to [themselves], for nominal consideration without shareholder approval, [Series B stock] that increased their purported voting power over [TCI] from less than 1% to just over 30%." J.A. at 264. This passage alone demonstrates the disconnect between the named parties and the actual owners of the Series B shares; there are only two named Taubmans (William and Robert), yet they do not own enough Series B shares to give them a 30% voting block over TCI. It is only the combined partnerships that possess such a large bloc of shares. Throughout his substantive allegations, Glancy uses the term "Taubman family" broadly and non-literally. For example, he states that "[t]he Taubman Family currently owns both Series B [shares] and common

stock which purportedly provide them with approximately 30% of the voting power of [TCI]," J.A. at 272, even though the 30% voting block is in reality owned by absentee parties, such as TG Partners, TRV, and TRA Partners.

The purpose of Glancy's action was to remove the impediment to acquisition created by the Series B shares, which he contended gave the "Taubman family" the power to veto any sale of TCI and to prevent the consummation of any tender offers, thus entrenching the family's control over the company to the alleged derogation of the non-Series B shareholders. *See* J.A. at 274-77 (Am. Compl.). Accordingly, the relief sought by Glancy is not limited to the invalidation of just a few Series B shares, as Glancy wanted "a declaration that the Taubman family may not validly vote the Series B [shares] under circumstances that would have the effect of . . . disenfranchising the public shareholder body." J.A. at 297. It is only the large 30% voting bloc controlled by TG Partners and others that would have such an effect. Glancy also requested injunctive relief that would "prohibit[] the Taubman family from voting the Series B [shares]," J.A. at 295, so as to abrogate the "effective veto position for the Taubman family." J.A. at 296. It is patently clear that Glancy's complaint seeks the invalidation of all the Series B shares owned by the archipelago of partnerships controlled by the "Taubman family," which together possess the blocking position Glancy seeks to abrogate.

We vacate the district court's judgment and remand the case for further proceedings. Because Glancy has sought relief that will affect the interests of various absentees, it is necessary to engage in a Rule 19 analysis to assess the proper parties to Glancy's lawsuit and to determine whether the application of Rule 19 impacts the district court's ability to hear the case. We first consider the threshold question of whether TG Partners is a "necessary" party and answer in the affirmative because TG Partners's interest in voting its Series B shares would be impeded or impaired by the requested relief. The joinder of TG Partners as a defendant is not

possible because of the citizenship of two of its constituent partners, which raises the question of whether TG Partners is an "indispensable" party pursuant to Rule 19(b) such that we cannot "in equity and good conscience," Fed. R. Civ. P. 19(b), proceed without TG Partners. The answer to that inquiry centers on whether any named parties (TCI or the TCI Board), or any other absentees who should be joined as necessary parties, can adequately represent the interests of TG Partners. We hold that none of the named parties can adequately represent the interests of TG Partners, but we cannot determine at this time whether Alfred Taubman, another absentee whose interests may be impaired by a judgment in Glancy's favor, can adequately represent the interests of TG Partners. Upon remand we instruct the district court to consider the issue.

## A. Federal Rule of Civil Procedure 19

We begin by analyzing the joinder provisions of the Federal Rules of Civil Procedure. We have subject matter jurisdiction over "all civil actions where the matter in controversy exceeds the sum or value of $75,000 . . . and is between [] citizens of different States . . . ." 28 U.S.C. § 1332(a)(1).[7] It is well settled that as a matter of statutory construction, diversity of citizenship requires complete diversity between all plaintiffs on one side and all defendants on the other side. *See Caterpillar, Inc. v. Lewis*, 519 U.S. 61, 68 (1996). Parties seeking to evade the complete-diversity rule may attempt to maintain federal jurisdiction by failing to name persons or entities that have an interest in the litigation and otherwise should be named. Federal Rule of Civil Procedure 19 addresses this problem by providing guidance for the joinder

[7]The district court did not assess TCI's alternative argument that Glancy failed to fulfill the amount-in-controversy requirement of 28 U.S.C. § 1332(a) because the district court ruled on the diversity-of-parties issue. Upon remand the district court should analyze this argument to ensure that the $75,000 jurisdictional-amount threshold is met.

of persons needed for just adjudication. It establishes guidelines for determining when it is proper to dismiss a case because a person or entity has an interest in the outcome of the litigation that could be impaired in the absence of that person or entity, but joinder of the person or entity will deprive the court of subject matter jurisdiction. Rule 19 provides:

(a) Persons to be Joined if Feasible. A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if (1) in the person's absence complete relief cannot be accorded among those already parties, or (2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may (i) as a practical matter impair or impede the person's ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest. If the person has not been so joined, the court shall order that the person be made a party. If the person should join as a plaintiff but refuses to do so, the person may be made a defendant, or, in a proper case, an involuntary plaintiff. If the joined party objects to venue and joinder of that party would render the venue of the action improper, that party shall be dismissed from the action.

(b) Determination by Court Whenever Joinder Not Feasible. If a person as described in subdivision (a)(1)-(2) hereof cannot be made a party, the court shall determine whether in equity and good conscience the action should proceed among the parties before it, or should be dismissed, the absent person being thus regarded as indispensable. The factors to be considered by the court include: first, to what extent a judgment rendered in the person's absence might be prejudicial to

the person or those already parties; second, the extent to which, by protective provisions in the judgment, by the shaping of relief, or other measures, the prejudice can be lessened or avoided; third, whether a judgment rendered in the person's absence will be adequate; fourth, whether the plaintiff will have an adequate remedy if the action is dismissed for nonjoinder.

Fed. R. Civ. P. 19.

The current phrasing of Rule 19 reflects the 1966 amendment of the rule. The changes eschew rigid application and adopt a more pragmatic approach. *Provident Tradesmens Bank & Trust Co. v. Patterson*, 390 U.S. 102, 116 n.12 (1968). As the Supreme Court described it,

Where the new version emphasizes the pragmatic consideration of the effects of the alternatives of proceeding or dismissing, the older version tended to emphasize classification of parties as 'necessary' or 'indispensable.' Although the two approaches should come to the same point, since the only reason for asking whether a person is 'necessary' or 'indispensable' is in order to decide whether to proceed or dismiss in his absence and since that decision must be made on the basis of practical considerations, and not by prescribed formula, the Committee concluded, without directly criticizing the outcome of any particular case, that there had at times been undue preoccupation with abstract classifications of rights or obligations, as against consideration of the particular consequences of proceeding with the action and the ways by which these consequences might be ameliorated by the shaping of final relief or other precautions.

*Id.* (internal citations and quotations omitted). "Ideally, all . . . parties would be before the court. Yet Rule 19 calls for a pragmatic approach . . . ." *Smith v. United Bhd. of Carpenters*, 685 F.2d 164, 166 (6th Cir. 1982). "Thus, the

rule should be employed to promote the full adjudication of disputes with a minimum of litigation effort." 7 Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, *Federal Practice & Procedure* § 1602, at 20 (3d ed. 2001). In sum, "the essence of Rule 19 is to balance the rights of all those whose interests are involved in the action." *Id.*

## B. Standard of Review

We review de novo the district court's decision that a party is indispensable under Federal Rule of Civil Procedure 19(b) as well as the decision that the court lacks subject matter jurisdiction. *Keweenaw Bay Indian Cmty. v. Michigan*, 11 F.3d 1341, 1346 (6th Cir. 1993) (failure to join an indispensable party); *Caudill v. N. Am. Media Corp.*, 200 F.3d 914, 916 (6th Cir. 2000) (lack of subject matter jurisdiction). We review a Rule 19(a) determination that a party is necessary under an abuse-of-discretion standard. *Keweenaw Bay*, 11 F.3d at 1346.

## C. Rule 19 Joinder of TG Partners

### 1. The Three-Part Test

Assessing whether joinder is proper under Rule 19 is a three-step process. *See* 4 James Wm. Moore et al., *Moore's Federal Practice*, § 19.02[3][a], at 19-17 (3d ed. 2003) ("The compulsory party joinder inquiry is a three-step process."); 7 *Federal Practice & Procedure* § 1604, at 39-40 (describing a three-step process); *W. Md. Ry. Co. v. Harbor Ins. Co.*, 910 F.2d 960, 961 (D.C. Cir. 1990) (Thomas, J.) ("When a party to a federal lawsuit moves to join a nonparty resisting joinder, the district court must answer three questions: . . . Is the absentee's presence necessary? If the absentee's presence is necessary, is her joinder feasible? If the absentee's joinder is not feasible, is she indispensable?"); *cf. Local 670, United Rubber Workers v. Int'l Union, United Rubber Workers*, 822 F.2d 613, 618 (6th Cir. 1987) ("*Local 670*") (describing a similar three-part test when a question of personal jurisdiction

may make the joinder of a person unfeasible). First, the court must determine whether the person or entity is a necessary party under Rule 19(a). *See Temple v. Synthes Corp.*, 498 U.S. 5, 8 (1990) (establishing that Rule 19(b) inquiry is required only if party satisfies the threshold requirements of Rule 19(a)). Second, if the person or entity is a necessary party, the court must then decide if joinder of that person or entity will deprive the court of subject matter jurisdiction. *W. Md. Ry. Co.*, 910 F.2d at 961 ("If the absentee should be joined, can the absentee be joined?"); 4 *Moore's Federal Practice* § 19.02[3][b], at 19-18 ("If the absentee is necessary . . . the next question is whether joinder of the absentee is feasible."). Third, if joinder is not feasible because it will eliminate the court's ability to hear the case, the court must analyze the Rule 19(b) factors to determine whether the court should "in equity and good conscience" dismiss the case because the absentee is indispensable. *W. Md. Ry. Co.*, 910 F.2d at 961 ("If the absentee cannot be joined, should the lawsuit proceed without [him or] her nonetheless?"); 4 *Moore's Federal Practice* § 19.02[3][c], at 19-20 ("Once a necessary absentee's joinder is found infeasible, the court has only two options: to proceed or dismiss."). Thus, a person or entity "is only indispensable, within the meaning of Rule 19, if (1) it is necessary, (2) its joinder *cannot* be effected, and (3) the court determines that it will *dismiss the pending case* rather than proceed in the case without the absentee." 4 *Moore's Federal Practice* § 19.02[3][c], at 19-22.

## 2.  Rule 19 and "Adequately Represented"

Before deciding pursuant to Rule 19 whether various Series B shareholders must be joined or the case must be dismissed if the shareholders cannot be joined, we must analyze whether the presence of a party that can "adequately represent" the interests of the absentee shortens our Rule 19 inquiry. The subsection of Rule 19(a) that is most pertinent to this question makes joinder compulsory when the absent person or entity "claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's

absence may [] as a practical matter impair or impede the person's ability to protect that interest." Fed. R. Civ. P. 19(a)(2)(i). This test "reflects the interest in avoiding the prejudice that might befall the absentee's interest if the litigation proceeded without the absentee." 4 *Moore's Federal Practice* § 19.03[1], at 19-34.

What if a person or entity already named as a party to the action has the same interests and litigation goals as the absentee whose joinder is at issue? Can an absentee suffer the impairment or impediment of its interests if another party, who has already been named, is fighting the same fight? Moreover, if an absentee's interests can be adequately represented by an existing party, should we consider that fact at the Rule 19(a) stage or at the Rule 19(b) stage? We have not definitively answered these questions previously, although our lone decision that touches on the issue suggests that adequate representation should be considered when evaluating the Rule 19(b) factors. *Local 670*, 822 F.2d at 622 (considering whether the absent entity's interest was adequately represented by an already-named party under the Rule 19(b) factors); *see also Prof'l Hockey Club Cent. Sports Club of the Army v. Detroit Red Wings, Inc.*, 787 F. Supp. 706, 713 (E.D. Mich. 1992) (same). The first Rule 19(b) factor to evaluate is "to what extent a judgment rendered in the person's absence might be prejudicial to the person or those already parties." Fed. R. Civ. P. 19(b). Many courts have suggested that the presence of a party with identical interests to the person or entity whose joinder is in question serves to mitigate any prejudice that might befall the absentee because of the identity of their interests. *See Local 670*, 822 F.2d at 622 (holding that a union's presence at the particular arbitration proceeding in question was not essential because a named party had the same interest in avoiding arbitration as the union); *Dainippon Screen Mfg. Co. v. CMFT, Inc.*, 142 F.3d 1266, 1272 (Fed. Cir. 1998) (ruling that any prejudice to subsidiary would be mitigated by presence of parent company in the litigation because both subsidiary and parent shared common interest of preserving a patent). Several circuits

have addressed this question of adequate representation as part of a Rule 19(b) analysis, as opposed to during the threshold Rule 19(a) analysis. *See, e.g., Witchita & Affiliated Tribes of Okla. v. Hodel*, 788 F.2d 765, 774-75 (D.C. Cir. 1986); *Hansen v. Peoples Bank of Bloomington*, 594 F.2d 1149, 1153 (7th Cir. 1979); *Prescription Plan Serv. Corp. v. Franco*, 552 F.2d 493, 497 (2d Cir. 1977).

Other circuits have employed an adequate representation test when considering whether a person or entity should be joined under Rule 19(a); they have ruled that there will be no impairment or impediment of an absent person's or entity's interest under Rule 19(a)(2)(i) if a named party is already adequately representing that interest. For example, the Ninth Circuit has ruled that "[i]mpairment may be minimized if the absent party is adequately represented in the suit." *Makah Indian Tribe v. Verity*, 910 F.2d 555, 558 (9th Cir. 1990)[8]; *see also Washington v. Daley*, 173 F.3d 1158, 1167 (9th Cir. 1999) ("As a practical matter, an absent party's ability to protect its interest will not be impaired by its absence from the suit where its interest will be adequately represented by existing parties to the suit."). That court employs a three-factor test "in determining whether existing parties adequately represent the interests of the absent[ee]": (1) whether the named party "undoubtedly" will make all the arguments that the absent person or entity would make; (2) whether the named party is "capable of and willing to make such arguments"; and (3) whether the absent person or entity would "offer any necessary element to the proceedings" that the named party would not. *Shermoen v. United States*, 982 F.2d 1312, 1318 (9th Cir. 1992) (quotations omitted). Various other circuits also account for adequacy of

---

[8]Interestingly enough, the court in *Makah* engrafts an "adequate representation" test onto Rule 19(a) by citing to the D.C. Circuit's decision in *Wichita & Affiliated Tribes of Okla. v. Hodel*, 788 F.2d 765, 774-75 (D.C. Cir. 1986), which considered the question of adequate representation as part of a Rule 19(b) analysis.

representation in their Rule 19(a) analyses, but they employ a more rigorous test that requires close to a "perfect identity of interests" in order for representation to be adequate. *Tell v. Trs. of Dartmouth Coll.*, 145 F.3d 417, 419 (1st Cir. 1998) ("[W]ithout a perfect identity of interests, a court must be very cautious in concluding that a litigant will serve as a proxy for an absent party."); *see also Nat'l Union Fire Ins. Co. v. Rite Aid of S.C., Inc.*, 210 F.3d 246, 251 (4th Cir. 2000) ("A court should hesitate to conclude . . . that a litigant can serve as a proxy for an absent party unless the interests of the two are identical."); *Pujol v. Shearson/Am. Express, Inc.*, 877 F.2d 132, 135 (1st Cir. 1989) (Breyer, J.) (finding that named party adequately represented the interests of the absentee when the interests of both entities were "virtually identical").

There is clearly considerable overlap between Rule 19(a)(2)(i) and Rule 19(b). 4 *Moore's Federal Practice* § 19.05[2][a], at 19-86 to 19-87 ("[The first 19(b) factor] clearly overlaps with the considerations of whether an absentee is necessary under the 'impair or impede' clause . . . ."); *Kickapoo Tribe of Indians v. Babbitt*, 43 F.3d 1491, 1497 n.9 (D.C. Cir. 1995) ("The inquiry as to prejudice under Rule 19(b) is the same as the inquiry under Rule 19(a)(2)(i) regarding whether continuing the action will impair the absent party's ability to protect its interest."). Yet, in order to be faithful to the text and purposes of the rules and to provide parties with guidance, it is necessary to decide at what stage of the three-part Rule 19 test does adequacy of representation play a role. Some courts believe that it is proper to assess the question of adequate representation during the first (Rule 19(a)) stage of the analysis, even though this can make consideration of the first Rule 19(b) factor completely redundant. However, in part because of our sole decision on this issue, *see Local 670*, 822 F.2d at 622, it is proper that adequacy of representation should be considered as part of the Rule 19(b) multifactor analysis.

Adequate representation should be considered as a part of the Rule 19(b) analysis, and not the threshold Rule 19(a)

analysis, because: (1) the text of Rule 19(a)(2)(i) does not support an adequate-representation component, especially when juxtaposed with the text of Rule 24(a); and (2) consideration of whether an absentee's interests are adequately represented will almost always occur only when the absentee should be joined under Rule 19(a)(2)(i), but cannot be joined for jurisdictional reasons, in which case the four factors of Rule 19(b) will need to be weighed.

First, the text of Rule 19(a)(2)(i) mentions nothing about measuring adequacy of representation. The importation of an "adequate representation" test into Rule 19(a)(2)(i) is prompted by the similarities between the provisions of Rule 19(a) and Federal Rule of Civil Procedure 24(a), which provides for intervention as a matter of right. The language of Rule 24(a)(2) is *nearly* identical, but in one critical way, not *exactly* identical, to that of Rule 19(a)(2)(i). Rule 24(a)(2) states, "Upon timely application anyone shall be permitted to intervene in an action . . . when . . . the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest, *unless the applicant's interest is adequately represented by existing parties.*" Fed. R. Civ. P. 24(a)(2) (emphasis added). Intervention of right pursuant to Rule 24(a) is "a kind of counterpart to Rule 19(a)(2)(i)." Fed. R. Civ. P. 24(a), 1966 Advisory Comm. Notes (cited in *Cascade Natural Gas Corp. v. El Paso Natural Gas Co.*, 386 U.S. 129, 134 n.12 (1967)); *see also Pujol*, 877 F.2d at 135 (noting similarity between Rule 19(a)(2)(i) and Rule 24(a)(2)). Rule 24, which was amended contemporaneously with Rule 19 in 1966, and has not changed substantively since that time, "provides that an applicant is entitled to intervene in an action when his position is comparable to that of a person under Rule 19(a)(2)(i), as amended, *unless his interest is already adequately represented in the action by existing parties*." Fed. R. Civ. P. 24(a), 1966 Advisory Comm. Notes (emphasis added). Given that both Rules were amended at the exact same time and that Rule 24 explicitly mentions its relationship to Rule 19(a)(2)(i), the absence of an "adequate

representation" clause in Rule 19(a)(2)(i) is impossible to ignore.

Second, the practical realities of joinder explain why consideration of adequate representation should occur as part of the Rule 19(b) analysis. Rule 19 is the tool of the defendant, as the plaintiff has the power to choose which parties it wishes to sue and generally has ample freedom to amend its complaint to add a party.[9] Aside from the rare instance of pure altruism, it is difficult to conceive of a reason why a defendant would invoke Rule 19(a)(2)(i), as opposed to the other provisions of Rule 19(a),[10] for any reason other than to seek dismissal of the case. The defendant has no incentive to invoke Rule 19(a)(2)(i) unless the absentee that the defendant seeks to join cannot be joined for reasons of jurisdiction or venue and because the defendant seeks to rid itself of the case.[11] The issue of adequate representation will thus likely only arise in a situation in which the absentee should be joined under Rule 19(a)(2)(i), but cannot be, in which instance the court proceeds to analyze the four factors of Rule 19(b) to "determine whether in equity and good conscience" the action should be dismissed because of the indispensability of the absentee. Fed. R. Civ. P. 19(b).

---

[9] Rule 19 could also be used by the plaintiff when the defendant files a counterclaim and raises an issue that the plaintiff then claims impacts an absentee who should be joined.

[10] It is quite likely that a defendant would seek joinder of an absentee under Rule 19(a)(2)(ii) out of the defendant's self-interest even if there is no hope of the case being dismissed for jurisdictional reasons; a defendant may want to join all absentees so that it can avoid costly, duplicative, or inconsistent litigation.

[11] Joinder via Rule 19(a)(2)(i) provides defendants with a counterweight to plaintiffs' incentive to fail to join "necessary" persons or entities whose presence could threaten the court's jurisdiction when the plaintiff wants to remain in federal court. Rule 12(b)(7) permits defendants to seek dismissal and penalize plaintiffs for the failure to join a party pursuant to Rule 19. *See* Fed. R. Civ. P. 12(b)(7).

To consider adequacy of representation as part of the determination of whether a party should be joined pursuant to Rule 19(a)(2)(i) analysis is to undermine the factor-balancing test of Rule 19(b). If, for example, adequacy of representation were considered as part of the Rule 19(a)(2)(i) analysis, an absentee whose interests were adequately represented would not be joined. Yet, such a result would be unfortunate if in reality the absentee's joinder would create a jurisdictional problem and the other three Rule 19(b) factors suggest that the proper course is to dismiss the case because the court "in equity and good conscience" cannot proceed without the absentee. Adequacy of representation then becomes a trump card, mooting consideration of Rule 19(b) in its entirety. Furthermore, to the extent that Rule 19(a)(2)(i) and Rule 19(b) are redundant,[12] eliminating the repetition by considering adequate representation in the Rule 19(a) stage improperly amends the text of Rule 19 by adding language to Rule 19(a)(2)(i) and rendering language in Rule 19(b) surplusage.

---

[12]Some courts have held the Rule 19(b) and Rule 19(a)(2)(i) analyses are indistinguishable. *See Kickapoo Tribe of Indians v. Babbitt*, 43 F.3d 1491, 1497 n.9 (D.C. Cir. 1995). Commentators have disagreed, suggesting that while the analyses are similar, they differ in degree; the Rule 19(a)(2)(i) analysis entails a much more hypothetical examination of whether nonjoinder *could* harm the absentee, but the Rule 19(b) analysis is concerned with a more concrete assessment of whether nonjoinder will *actually* cause harm. 4 James Wm. Moore et al., *Moore's Federal Practice,* § 19.05[2][a], at 19-87 (3d ed. 2003); *see also* 7 Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, *Federal Practice & Procedure* § 1604, at 62 (3d ed. 2001). However persuasive these commentators' rationales may seem, they are not supported by the text of Rule 19, which uses the word "may" in Rule 19(a)(2)(i) and the word "might" in Rule 19(b), belying any argument that the two are substantively different. There is no need to resolve the textual interpretation issue, because no matter whether the two analyses are identical or qualitatively different, it does not alter the conclusion that adequacy of representation should be considered solely as a Rule 19(b) factor given the text and operation of Rule 19.

There is no justification for considering adequacy of representation during the threshold analysis of whether a absentee is "necessary" when the text of Rule 19(a) does not command it and when, in most instances of this ilk, adequacy of representation will need to be assessed as part of a Rule 19(b) analysis anyway. It makes more sense simply to consider adequacy of representation as a part of the first factor of Rule 19(b), where it will most often need to be considered, rather than to read into Rule 19(a)(2)(i) language that does not exist.[13]

### 3. The Application of Rule 19

In applying Rule 19 here, the district court held that TG Partners was an indispensable party. The district court specifically held that the citizenship of TG Partners had to be considered for diversity purposes and that the overlap of Glancy's California citizenship with that of two of the general

---

[13]There are curious interactions between Rule 19 joinder and Rule 24 intervention. Rule 24 is the implement of the absentee, as the absentee can petition for intervention without any involvement by the defendant when the absentee stands to have its interests harmed. This raises the question of why a defendant would ever need to utilize Rule 19(a)(2)(i) if the absentee can just intervene. One potential answer is that the defendant may be quicker than the potential intervenor. Nonetheless, some commentators have criticized Rule 19 and endorsed intervention as the most appropriate approach. *See, e.g.*, Richard D. Freer, *Rethinking Compulsory Joinder: A Proposal to Restructure Federal Rule 19*, 60 N.Y.U. L. Rev. 1061, 1086-88 (1985). They have encouraged courts and the Congress to expand the concept of ancillary jurisdiction to encompass intervenors whose presence would destroy jurisdiction so that Rule 19 joinder would no longer need to be used. *Id.* However meritorious this argument, Congress chose the exact opposite course in 1990. In the Judicial Improvements Act of 1990, Pub. L. 101-650, 104 Stat. 5089 (1990) (codified at 28 U.S.C. § 1367(b)), Congress explicitly provided that federal courts cannot exercise supplemental jurisdiction over persons or entities joined pursuant to Rule 19 or Rule 24. This legislation significantly limited the usefulness of the intervention mechanism. *See* 7 Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, *Federal Practice & Procedure* § 1610, at 151-53.

partners of TG Partners would destroy diversity. The district court made two chief errors: one of fact and one of logic. First, the district court erroneously stated that Alfred Taubman was the managing general partner of TG Partners; in fact TG Michigan, Inc., a Michigan corporation, of which Alfred Taubman is the sole shareholder, is the managing general partner. J.A. at 473-74. Second, after determining that TG Partners did not need to be joined because its interests could be represented by Alfred Taubman, the district court wrote:

> [I]t cannot be disputed that A. Alfred Taubman has an interest in his ability to vote the Series B stock that he owns or controls. This fact implicates the joinder provisions of [Rule] 19, under which either: 1) A. Alfred Taubman is an indispensable party who should be joined so that his interests can be adequately protected; or (2) A. Alfred Taubman is a dispensable party who does not need to be joined because his interest will be adequately protected since they are identical to his sons, . . . who are named defendants . . . .

J.A. at 917-18 (Dist. Ct. Op. 05/08/03). This formulation improperly creates a false dichotomy in the application of Rule 19. Alfred Taubman cannot be considered "an indispensable party who should be joined" because an indispensable party by definition cannot be joined. Nor is he a "dispensable" party, as that term has no meaning under Rule 19.

### a. Is TG Partners "Necessary"?

Regarding TG Partners, the first inquiry of the three-step test must be answered in the affirmative. TG Partners falls within the reach of Rule 19(a)(2)(i), as it "claims an interest relating to the subject of the action and is so situated that the disposition of the action in [TG Partners's] absence may (i) as a practical matter impair or impede [TG Partners's] ability to protect that interest." Fed. R. Civ. P. 19(a)(2)(i). First, TG

Partners's interest is in the continued validity of its 6.3 million Series B shares. Second, the granting of an injunction and declaration would place the Series B shares at the center of the litigation. Third, TG Partners is "so situated that the disposition of the action" in its absence would undoubtedly impede its interest in the shares because an injunction against the use of the Series B shares would prevent TG Partners from voting its sizeable stake.[14] Thus, TG Partners is a necessary party under Rule 19(a).

### b. Can TG Partners Be Joined?

Continuing to the next step of the three-part test, TG Partners cannot be joined because its presence would violate the complete-diversity requirement. Section 1332 requires complete diversity, and it is settled that a limited partnership is a citizen of each state in which its partners (general or

---

[14] Possibly realizing the corner into which he has backed himself, Glancy argues in his reply brief that he did not seek to void the voting rights of all the Series B stock, but rather sought to enjoin only the voting stock of the named defendants. He thus suggests that any injunction issued by the court would not impact the ability of Alfred Taubman or TG Partners to exercise its votes. Glancy Reply Br. at 5-6. This argument is specious, as we have explained more fully, *supra* pps. 11-12. In his amended complaint, Glancy sought "a declaration that the Taubman family's Series B Preferred Stock does not have any voting rights," J.A. at 295 (Am. Compl.), in order to prevent the "Taubman family" from "thwart[ing] any unsolicited acquisition proposal for [TCI]." J.A. at 263-64. Throughout the amended complaint, Glancy uses the term "Taubman family" to describe more than just William and Robert Taubman, who were the only Taubman family members named. Also, the text of the amended complaint mentions "[n]on-party A. Alfred Taubman" and states that Alfred Taubman "owns and/or controls" over 24 million shares of Series B stock. J.A. at 267-68. Furthermore, Glancy's action would have been futile if he did not intend to enjoin all the shares controlled by the web of entities under the Taubman family's command. Enjoining the Taubman sons' 12,000 Series B votes would not have even remotely accomplished the objective of Glancy's litigation, which was to "enjoin any vote by the Taubmans of their purported blocking position," J.A. at 265, because the remaining 23.9 million shares could still have been voted to quash SPG's takeover attempt.

limited) are citizens.  *Carden v. Arkoma Assocs.*, 494 U.S. 185, 195-196 (1990).  Here, the joinder of TG Partners is not possible, because two general partners hail from California, which is plaintiff Glancy's state of citizenship.

### c.  Must the Action Be Dismissed Because TG Partners is Indispensable?

The final step then is to determine whether the court should "in equity and good conscience" dismiss the action because TG Partners is indispensable according to the factors described in Rule 19(b).  Courts are to consider at least four factors in assessing whether the action should be dismissed, including (but not limited to), "first, to what extent a judgment rendered in the person's absence might be prejudicial to the person . . . ; second, the extent to which, by protective provisions in the judgment, by the shaping of relief, or other measures, the prejudice can be lessened or avoided; third, whether a judgment rendered in the person's absence will be adequate; [and] fourth, whether the plaintiff will have an adequate remedy if the action is dismissed for nonjoinder."  Fed. R. Civ. P. 19(b).  The final three factors clearly suggest that the court cannot proceed in the absence of TG Partners.  First, the district court could not have mitigated the prejudice to TG Partners of being denied the voting power of its shares except by denying the requested injunction.  Second, a judgment in which the shares of TG Partners were not invalidated may not have been adequate for plaintiff Glancy, because those 6.3 million shares could be the difference between success and failure in SPG's (or any other future acquirer's) attempt to acquire the two-thirds of all available shares needed to delete the Ownership Limit Provision.  Third, Glancy would still have an adequate state court remedy if the federal court case were dismissed.

The remaining factor requires us to consider whether "a judgment rendered in [TG Partners]'s absence might be prejudicial to [TG Partners]."  Fed. R. Civ. P. 19(b).  As described above, the analysis of this factor requires an

examination of whether TCI, the TCI Board, or any other parties can adequately represent the interests of TG Partners. As we explain further below, TCI and the TCI Board, as named parties, do not adequately represent the interests of TG Partners because the complete identity of interests that is required to satisfy Rule 19(b) does not exist.  Yet, in trying to determine whether any other absentee can adequately protect the interests of TG Partners, we are unable to determine, based upon the record at this stage of the litigation, whether Alfred Taubman can adequately protect the interests of TG Partners if he can be joined as a party.  We therefore remand to the district court for further consideration of these issues.

### i. Adequate Representation by TCI and the TCI Board

We begin by resolving the question of whether a named corporation or board of directors can adequately represent the interests of shareholders whose shares are threatened to be invalidated.[15]  At the outset, we note that several pre-1966 Rule 19 cases, including the one Sixth Circuit case on the issue, broadly discuss the issue of the "indispensability" of shareholders whose shares will be invalidated, even though these cases do not analyze whether a named corporation or board of directors can adequately represent the interests of those shareholders.  These cases are dated, in their use of the older, more inflexible Rule 19 analysis, but they help to demonstrate the pattern of the courts' unwillingness to proceed in the absence of shareholders whose shares will be invalidated by the action.  In *General Investment Co. v. Lake Shore & Michigan Southern Railway Co.*, 250 F. 160 (6th Cir. 1918), a plaintiff shareholder sought to enjoin a larger shareholder from voting its stock in favor of a merger.  The court concluded that the larger shareholder was an

---

[15]Our holding is limited to a situation in which the relief sought is the invalidation of a large number of shares held by a small number of shareholders.

indispensable party, writing that "[a] stockholder in a corporation is an indispensable party to a suit seeking to enjoin him from voting his stock at a stockholders' meeting." *Id.* at 171; *see also Gen. Inv. Co. v. Lake Shore & Mich. S. Ry. Co.*, 260 U.S. 261, 285 (1922) (affirming the Sixth Circuit's decision and stating that if the action sought to enjoin a shareholder's voting rights, it was "obvious that the [larger shareholder] was an indispensable party"); *Tucker v. Nat'l Linen Serv. Corp.*, 200 F.2d 858, 863 (5th Cir. 1953) (ruling that a shareholder is an indispensable party to an action that attempts to void his shares); *Steinway v. Majestic Amusement Co.*, 179 F.2d 681, 684 (10th Cir. 1949), *cert. denied*, 339 U.S. 947 (1950) (same). A more recent, post-1966 Rule 19 case reaches a similar result. *Klaus v. Hi-Shear Corp.*, 528 F.2d 225, 234-35 (9th Cir. 1975). Additionally, several commentators have stated generally that when a "plaintiff sues a corporation to compel stock of absentee to be canceled and reissued in the joint names of plaintiff and absentee . . . [the] absentee has an interest in the proceedings and its ability to protect that interest could be impaired by a judgment in the pending case." 4 *Moore's Federal Practice* § 19.03[3][c], at 19-51; *see also* 7 *Federal Practice & Procedure* § 1615, at 236 (stating that joinder depends upon nature of interest in the controversy and citing to a case involving cancellation of stock that was dismissed because a "necessary" party could not be joined); 9A William M. Fletcher, *Cyclopedia of the Law of Private Corporations* §4474, at 84 (Rev. ed. 2000) ("If . . . shareholders . . . have distinct and indivisible individual rights which will be affected in the action by or against the corporation, they must be joined as coparties.").

More specific to the acute inquiry here, courts have held that a corporation cannot always adequately represent the interests of shareholders when the invalidation of shares is involved. In *Istituto Bancario Italiano SpA v. Hunter Engineering Co.*, 449 A.2d 210 (Del. 1982), a bank brought suit against several defendants, including the stock-issuing company, Hunter Engineering, alleging that Hunter and its

parent defrauded the bank by issuing a block of shares that were eventually sold to another entity, "Tools." *Id.* at 212. Tools had been named as a defendant, but defendant Hunter moved to dismiss under Rule 12(b)(7) because the court could not assert personal jurisdiction over Tools. The Delaware Supreme Court[16] wrote that "the current owner of the shares which plaintiff IBI seeks to have canceled[] clearly has an interest relating to the subject matter of the action such that disposition of the action in its absence as a practical matter may impair or impede its ability to protect that interest." *Id.* at 226. The court believed that Tools "me[t] the criterion set forth in Rule 19 for an indispensable party" even though the corporation that issued the stock had also been named, but the court ultimately ruled that the action did not need to be dismissed because the court properly had personal jurisdiction over Tools. In so holding, the *Istituto* court followed a line of Delaware cases holding that shareholders are indispensable parties in actions to cancel or invalidate shares of stock. *Elster v. Am. Airlines, Inc.*, 106 A.2d 202 (Del. Ch. 1954); *Hodson v. Hodson Corp.*, 80 A.2d 180 (Del. Ch. 1951).[17] No

---

[16]There is no Michigan corporate law on this specific question. In the absence of clear Michigan law on matters of corporate law, Michigan courts often refer to Delaware law. J.A. at 919 (Dist. Ct. Op.) (quoting *In re Consumers Power Co. Derivative Litig.*, 132 F.R.D. 455, 461 (E.D. Mich. 1990)); *see also Russ v. Fed. Mogul Corp.*, 316 N.W.2d 454, 457 n.1 (Mich. App. 1982). Delaware employs its own Rule 19 that differs from Federal Rule of Civil Procedure 19 only in its use of gendered pronouns. *Istituto Bancario Italiano v. Hunter Eng'g Co.*, 449 A.2d 210, 226 (Del. 1982).

[17]Several single-judge-authored, unpublished opinions of the Delaware Chancery Court reach inconsistent results. We note the divergence, but we are not swayed by any of these unpublished opinions. In *National Education Corp. v. Bell & Howell Co.*, No. 7278, 1983 WL 8946 (Del. Ch. Dec. 13, 1983) (unpublished), a Chancellor assumed, without deciding, that the shareholders' interests could not be adequately represented by the named company, although it ultimately held based upon other Rule 19(b) factors that the action did not need to be dismissed. *Id.* at *4. By contrast, a different Chancellor in *Flerlage v. KDI Corp.*, No. Civ. A. 8007, 1986 WL 1397 (Del. Ch. Jan. 29, 1986) (unpublished),

federal court of which we are aware has held that a named corporation adequately represents the interests of a small group of shareholders who stand to lose a large number of shares such that those shareholders' interests will not be prejudiced in their absence. *But cf. OmniOffices, Inc. v. Kaidanow*, No. Civ. A. 99-0260, 2001 WL 1701683, at * 8 (D. D.C. Sept. 12, 2001), *rev'd on other grounds sub nom. CarrAmerica Realty Corp. v. Kaidanow*, 321 F.3d 165 (D.C. Cir. 2003) (shareholder controlling a substantial portion of shares to be voided was not indispensable because named party agreed to indemnify the absentee in the event that the shares were invalidated); *Wheaton v. Diversified Energy, LLC*, 215 F.R.D. 487, 490 n.2 (E.D. Pa. 2003) (holding that a subsidiary is adequately represented by the parent when its shareholder interests may be impacted).

Particularly in light of the tendency of courts to join all shareholders whose rights will be determined by litigation, we cannot say that TCI and the TCI Board adequately represent the interests of TG Partners. There is a similarity of interests, but the interests are not identical; TG Partners monolithically desires to maintain its voting rights while TCI and the TCI Board must respond to and defend themselves from various other charges of breach of fiduciary duties unrelated to the

---

held that the interests of holders of preferred stock would be fully protected by the named corporation. *Id.* at *6-7. It is difficult to consider *KDI* as persuasive because it directly conflicts with the *Istituto Bancario* decision and its line of predecessors but fails to reconcile the differences. Furthermore, the *KDI* decision places great weight on two federal appellate decisions that do not discuss the propriety of joining a shareholder that faces the invalidation of its stock or the voting rights in that stock. *See Owens-Illinois, Inc. v. Lake Shore Land Co.*, 610 F.2d 1185, 1191 (3d Cir. 1979) (ruling that a named plaintiff could represent the interests of the absentee when the action sought the termination of an option to purchase property); *Fetzer v. Cities Serv. Oil Co.*, 572 F.2d 1250, 1253-54 (8th Cir. 1978) (holding that absentee railroad did not need to be joined in an action regarding royalty payments because named plaintiff had a similar interest in receiving the royalty payments).

continued existence of the Series B shares.[18] These distinct but overlapping interests could come into conflict; TCI is responsible in this litigation to act not only for the best interests of the Series B shareholders, but for the best interests of the corporation and all its shareholders.

On appeal, Glancy does not even suggest that TCI or the TCI Board adequately represents the interests of TG Partners. Instead, Glancy argues that Robert and William Taubman, who are named parties, can adequately represent TG Partners's interests. Glancy Br. at 18. There are several reasons why this is questionable. First, the Taubman sons were named as members of the TCI Board, not as individual Series B shareholders. As explained above, the TCI Board's interests are not completely identical to those of TG Partners. Second, even if the Taubman sons were named as individual shareholders, they control a relatively tiny number of Series B shares in their own names (12,000 out of the 24 million shares controlled by the Taubman family). As individual shareholders, they would have a similar interest in fighting any action to invalidate the stock, but the intensity of that interest differs from TG Partners's interest, as TG Partners controls five hundred times more shares. Courts have held that asymmetry in the intensity of the interest can prevent a named party from representing the interests of the absentee. *See Nat'l Union Fire Ins. Co. v. Rite Aid of S.C., Inc.*, 210 F.3d 246, 251 (4th Cir. 2000) (holding that although both the named subsidiary and the unnamed parent had an identical interest in the subsidiary being covered as a beneficiary of a liability policy, the subsidiary could not represent the parent's interest regarding the impact of the court's decision on future cases concerning coverage); *Burger King Corp. v. Am. Nat'l Bank & Trust Co. of Chicago*, 119 F.R.D. 672, 678 (N.D. Ill.

---

[18] We cannot accept a rule by which a corporation, or any other party, is considered to represent the interests of the absentee simply by virtue of the corporation's attempt to invoke Rule 19 and join the absentee. To do so would render Rule 19 a nullity.

1988) (finding that even though named corporation/franchisor and unnamed franchisee both sought determinations that they did not violate the lease, the named franchisor could not adequately represent the interests of the franchisee because the latter faced greater future liability). Third, to the extent that Glancy is arguing that the Taubman sons can protect the interests of the Taubman family regarding the Series B stock because Alfred Taubman will exert his influence through their presence, *see* Glancy Br. at 18-19, Roberts and William's function in this capacity does not assure that the interests of the non-Taubman-family partners in TG Partners will be protected. *See infra* p.6-7 (partially listing the partners of TG Partners).

### ii. Adequate Representation by Alfred Taubman

Given that none of the named parties can adequately represent the interests of TG Partners, we must consider whether Alfred Taubman should be named as a necessary party who can represent the interests of the absentee, TG Partners. Glancy discussed Alfred Taubman in his complaint, but Glancy did not name Alfred Taubman as a defendant. In their answer and their brief opposing Glancy's action, defendants TCI and the TCI Board did not request that Taubman be joined. Nor did they file a Rule 12(b)(7) motion seeking dismissal of the action for failure to join Alfred Taubman. However, the district court considered the joinder of Alfred Taubman and its effect on whether the action should be dismissed pursuant to Rule 19(b). Both parties also discuss the issue in their appellate briefs. Glancy Br. at 17-19 (arguing that Alfred Taubman either directly, or indirectly through his sons, can adequately represent the interests of TG Partners, although not explicitly asking for Alfred Taubman's joinder); TCI Br. at 33 n.18. Furthermore, we may raise the issue of joinder sua sponte. 4 *Moore's Federal Practice* § 19.02[4][b][ii], at 19-27.

We discuss the joinder of Alfred Taubman mainly to assess whether the impact of his presence as a party and his ability

to represent the interests of TG Partners would obviate the need to dismiss the action because of TG Partners's effect on subject matter jurisdiction. Based upon the factual record we currently possess, we cannot determine whether Alfred Taubman, named in his individual capacity as the owner and/or voter of 17.7 million Series B Shares, can adequately represent the interests of TG Partners. Upon remand, the district court and the parties must address this issue. If TG Partners's interests will not be adequately represented by the joinder of Alfred Taubman in his individual capacity, Glancy's action must be dismissed because TG Partners will be indispensable given that the action cannot proceed in its absence. If TG Partners's interests can be adequately represented by Alfred Taubman, the district court must analyze whether Alfred Taubman's joinder is proper under the three steps of Rule 19. The court must assess whether Alfred Taubman has "an interest relating to the subject of the action and is so situated that the disposition of the action in [his] absence may (i) as a practical matter impair or impede [his] ability to protect that interest," Fed. R. Civ. P. 19(a)(2)(i), and whether his joinder is possible.[19] If his joinder is not

---

[19] The record on appeal reflects that Alfred Taubman owns or votes 17.7 million shares through TRV, TRA, Taub-Co, and the A. Alfred Taubman Revocable trust. Alfred Taubman is also the sole shareholder of the corporation, TG Michigan, Inc., that is the managing general partner of TG Partners and that votes all of the shares of TG Partners. It is alleged that Alfred Taubman votes TG Partners's Series B shares on behalf of the partners of TG Partners through TG Michigan, Inc. J.A. at 474 (Poissant Decl.). It is unclear based upon these facts whether there exists between TG Michigan, Inc. and Alfred Taubman "such a unity of interest and ownership that the separate personalities of the corporation and its owner cease to exist." *United States v. Cordova Chem. Co.*, 113 F.3d 572, 580 (6th Cir. 1997), *vacated on other grounds sub nom. Mich. Dep't of Envtl. Quality v. Bestfoods*, 524 U.S. 924 (1998). Alfred Taubman's relationship with TG Partners is important because the citizenship of all members of a partnership impacts diversity jurisdiction even if only one general partner, as opposed to the partnership itself, has been named as a party to a suit. *Halleran v. Hoffman*, 966 F.2d 45, 47-48 (1st Cir. 1992); *Stouffer Corp. v. Breckenridge*, 859 F.2d 75, 76 (8th Cir. 1988); *Carlsberg Res. Corp. v. Cambria Sav. & Loan Ass'n*, 554 F.2d

possible, the court must, pursuant to Rule 19(b), then determine whether "in equity and good conscience" the action can proceed in Alfred Taubman's absence or whether the action must be dismissed. Without the presence of a party who can adequately represent the interests of TG Partners, the action must be dismissed.

## III.  CONCLUSION

Because of the multiple pleading, jurisdictional, and joinder complications with this appeal, several of which cannot be resolved on the basis of this record, we **VACATE** the judgment of the district court. We **REMAND** to the district court with instructions to resolve the incongruence between the relief Glancy seeks and the parties he has named. The district court must analyze whether Alfred Taubman can adequately represent the interests of TG Partners and whether Alfred Taubman can be joined in his individual capacity as a Series B shareholder under the strictures of Rule 19. If Alfred Taubman cannot adequately represent the interests of TG Partners, the action must be dismissed because the court cannot "in equity and good conscience" proceed without TG Partners, whose interests will be impaired by a judgment invalidating the Series B stock, but who cannot be joined because of the requirement of complete diversity for subject matter jurisdiction.

---

1254, 1258-59 (3d Cir. 1977).  The Supreme Court has held that the citizenship of all members of a joint-stock company, which was referred to as a "mere partnership," must be considered even though the company brought suit only on behalf of its president. *Chapman v. Barney*, 129 U.S. 677, 682 (1889); *cf. United Steelworkers v. R.H. Bouligny, Inc.*, 382 U.S. 145 (1965) (citizenship of labor union consists of state of citizenship of each member of the union and not just union's principal place of business).

---

## CONCURRENCE

---

ROGERS, Circuit Judge, concurring.  I concur in the judgment and in Judge Moore's careful and thoughtful opinion, with the exception of part II.C.2.

In this case, it appears clear that "adequacy of representation" by one shareholder of an absent shareholder's interest is not enough to make the absent shareholder "unnecessary" for purposes of Rule 19(a).  "Adequacy of representation" therefore becomes relevant in the context of this case only at the Rule 19(b) stage.  I am reluctant to conclude, however, that "adequacy of representation" is categorically not to be considered as part of a Rule 19(a) analysis, and such a conclusion is unnecessary to our holding.

---

**CONCURRING IN PART, DISSENTING IN PART**

---

RYAN, Circuit Judge, concurring in part and dissenting in part. While I agree that the district court's judgment dismissing the plaintiff's lawsuit must be vacated and the case remanded, I respectfully disagree with the majority's analysis. I believe my colleagues have imposed on the plaintiff their own idea of the ideal complaint and the relief they think such a complaint should have requested, rather than reading the complaint as it was written. While the majority rightly faults Glancy for his wildly inconsistent use of the term "the Taubman family" throughout his amended complaint, the amended complaint clearly demonstrates that Glancy sought no relief with respect to A. Alfred Taubman. Glancy explicitly excluded from his suit "Non-party A. Alfred Taubman," who allegedly "own[ed] and/or control[ed] 186,937 shares of Taubman Centers common stock and 24,669,087 shares of Series B [stock]."

In my judgment, vacatur and remand are nevertheless appropriate because the district court failed to make adequate findings of fact and conclusions of law, thereby depriving this court of "'a sufficiently definite predicate for proper appellate review.'" *Cousin v. McWherter*, 46 F.3d 568, 574 (6th Cir. 1995) (citation omitted); *see also* Fed. R. Civ. P. 52.

The district court appears to have concluded that although A. Alfred Taubman was not named as a defendant in this suit, the plaintiff Glancy's request for declaratory and injunctive relief against "the Taubman family" would, if granted, prevent A. Alfred Taubman from voting "the Series B stock that he owns or controls." The district court then assumed that an injunction against A. Alfred Taubman in his individual capacity would prevent TG Partners (TG) from voting its Series B shares. The court appears to have relied upon cases in which general partners have been named either on behalf of their partnerships or in their capacity as partners, which suggests that the court thought that an injunction against a person in his individual capacity would have the same effect as an injunction against a person in his capacity as a general partner of a partnership. The court assumed, without explanation, that there was "no substantive difference" between an injunction against A. Alfred Taubman in his individual capacity and an injunction against him in the capacity of the managing general partner of TG. The first difficulty with this assumption is that A. Alfred Taubman is *not* the managing general partner of TG. A corporation of which A. Alfred Taubman is the sole shareholder is the managing general partner of TG. The district court made no findings of fact or conclusions of law to support its assumption that an injunction against A. Alfred Taubman individually would prevent a separate entity, the corporation of which he is the sole shareholder, from voting TG's Series B stock.

Although the district court appears to have concluded that if Glancy's requested relief were granted, A. Alfred Taubman (in some unspecified capacity) would suffer an impairment of "his ability to vote the Series B stock that he owns or controls," the court did not conduct a Federal Rule of Civil Procedure Rule 19 analysis with respect to A. Alfred Taubman. Instead, it merely concluded that regardless of whether A. Alfred Taubman should have been joined as a party, "if Glancy's relief is granted, the shares that A. Alfred Taubman controls through the TG partnership would be affected"; that is, TG would be prevented from voting its Series B shares. The court also failed to conduct a Rule 19 analysis with respect to TG, which, likewise, was not a named party in the action. Instead, it merely concluded that TG's citizenship had to be considered for diversity purposes.

In my judgment, the district court erred in taking an overly simplistic view of the jurisdictional complexities of this case. Specifically, it failed to distinguish between A. Alfred Taubman's various capacities, and instead, spoke generally of

A. Alfred Taubman's "interest in his ability to vote the Series B stock that he owns or controls."  In my view, the complexities of the case, particularly the various legal capacities in which A. Alfred Taubman is involved, required a far closer analysis.  I would remand the case to afford the court an opportunity to explain its reasoning.