NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 12a0623n.06

No. 10-1994

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED

*Jun 13, 2012*

LEONARD GREEN, Clerk

| | |
|---|---|
| LAETHEM EQUIPMENT COMPANY, a Michigan Corporation, LAETHEM FARM SERVICE COMPANY, a Michigan Corporation, MICHAEL T. LAETHEM, and MARK E. LAETHEM, <br><br> Plaintiffs-Appellees, <br><br> v. <br><br> DEERE & COMPANY, a Delaware Corporation, <br><br> Defendant-Appellant. | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN |

BEFORE:  McKEAGUE and WHITE, Circuit Judges; and BARRETT, District Judge.[*]

**HELENE N. WHITE, Circuit Judge.**  Defendant-Appellant Deere & Company ("Deere") appeals the district court's entry of judgment in favor of Plaintiffs-Appellees Laethem Equipment Company ("LEC"), Laethem Farm Service Company ("LFSC"), Michael T. Laethem, and Mark E. Laethem after a jury verdict in their favor, as well as the district court's denial of Deere's post-trial motions to alter the judgment and for new trial.  We **AFFIRM**.

**I.**

---

[*] The Honorable Michael R. Barrett, United States District Judge for the Southern District of Ohio, sitting by designation.

For many years, Francis Laethem operated two agricultural equipment dealerships, LFSC and LEC, in the "thumb" region of Michigan. In 1992, Francis put the stock of LEC and LFSC into a living trust ("Trust"). Upon Francis's death in 1993, his children Michael, Mark, and Kathryn Laethem became co-trustees of the Trust, and their mother, Francis's wife Anne Laethem, became the primary beneficiary. The Trust provided that upon Francis's death, Michael and Mark had the authority to manage the two dealerships, which they successfully did for several years.

A dispute developed among Michael, Mark, and Kathryn regarding the ownership of LEC and LFSC. Michael and Mark claim that in 1993 Michael, Mark, and Kathryn entered into an agreement on behalf of the Trust to sell the stock of the two companies to Mark and Michael. The agreement was not formally memorialized, but some corroborating evidence suggests a deal had been made, including the fact that Kathryn, a CPA, completed yearly tax returns that indicated that Mark and Michael each owned 50 percent of the LEC stock. Additionally, a Stock Purchase Agreement dated January 3, 1994 recites that the Trust sold its stock in LEC to Mark and Michael Laethem, and is signed by Mark and Michael Laethem on behalf of the Trust and on behalf of themselves as buyers, and is witnessed by Anne Laethem. A few months later, representing themselves as owners of LEC, Michael and Mark signed new dealership agreements with Deere on behalf of the companies.

In 2000, Deere conducted an audit of warranty claims submitted by LEC and LFSC and alleged improprieties amounting to $150,000. The parties settled the dispute for $20,000.

In 2001, Kathryn began raising objections to the business arrangements. She convened a meeting in July between herself, Michael, Mark, their four other siblings, and their mother Anne.

There, according to Mark's testimony, Kathryn informed Mark and Michael that she was being represented by legal counsel, that she would not honor the 1993 agreement to sell LEC and LFSC to Mark and Michael, and that she disputed its validity. In October 2001, after Anne came to the conclusion that she could not trust Mark and Michael because she believed they had engaged in financial improprieties, she executed a document purporting to remove them as trustees. Kathryn, proceeding to act as sole trustee, then executed a document removing Mark and Michael as officers and made herself the President and sole officer of LEC. The day-to-day operations of the business remained largely unchanged.

In late 2002, Kathryn, through her attorney, wrote a letter to Deere asserting that upon his death Francis Laethem had transferred one-hundred percent of the stock of LFSC and LEC to the Trust, and that Anne was its sole income beneficiary. (Pls.' Ex. 10, App. at 463–64.) The letter further noted that Anne had removed Michael and Mark as trustees and that Kathryn, as sole trustee, was empowered to sell real estate owned by the Trust. (*Id.*) The letter also stated that Kathryn "hoped" the information would enable Deere to "confidentially assist us in seeking a buyer for the dealerships and related real estate. If Michael Laethem and / or Mark Laethem terminates their employment prior to any sale, we would also request your assistance in seeking interim management." (*Id.*) Deere asserts this is the first time it was informed of a dispute regarding the ownership of LEC and LFSC.

According to Deere, Kathryn Laethem then met with Deere employees in early 2003 and explained that Michael and Mark had diverted profits from the Trust to benefit themselves and that she intended to fire Michael and Mark and sell the business to a third party. Kathryn asked Deere

representatives if they could help her locate a willing buyer who would be approved as a Deere dealer, and to recommend someone to assist in managing the businesses until they were sold. Deere suggested James Morgan, a retired Deere manager, as an interim manager. The following week, Kathryn contacted Morgan, who agreed that he would manage the Laethem businesses while Kathryn attempted a sale. That week, Kathryn was also in contact with J & D Implement, Inc. an Ohio-based John Deere dealer that inquired into Kathryn's sale of the Laethem companies.

On January 14, 2003, an employee in John Deere Credit's legal department emailed a Deere attorney with the results of her research into the ownership of LEC and LFSC, which showed that "Michael Laethem is the operator / owner of the business in Caro Mi and that . . . Mark is the owner operator in Fairgrove Michigan," and that the investigation showed "nothing with the State or Village filed with Kathryn Laethem's name on it." (Pls.' Ex. 13, App. at 488.)

On January 15, 2003, Mark and Michael Laethem went to a meeting at their dealership in Caro. Mark testified that the meeting had been set up by Deere employee Kevin Monk, and Mark understood that it would be attended by Michael, Mark, Monk and a Deere representative named Terry Porter, and would concern the possible purchase of another dealership in the area. There is dispute over whether Deere purported to terminate the dealerships at this meeting. Mark testified that when he and Michael arrived, Porter announced that Deere would no longer be doing business with them and would instead be dealing with Kathryn Laethem. Kathryn then entered the room with an armed guard, terminated Mark and Michael's employment with LEC and LFSC, and had them escorted home in police cars.

According to Deere, Monk and Porter were merely present at the meeting in order to protect Deere's security interest in inventory located at the Caro store, and the Dealership Agreements were not terminated until weeks later, after Kathryn agreed to sell LEC and LFSC to J & D Implement and wrote a letter requesting termination of the Deere Dealership Agreements during the closing of that sale. But Appellees contend that Deere induced Kathryn to execute a termination letter in order to protect itself against any argument that it had wrongfully terminated the dealership agreements, and that the dealership agreements had already been terminated at the January 15 meeting.

These events spawned a series of lawsuits. Michael and Mark Laethem filed a lawsuit in state court against Kathryn and the Trust requesting specific performance of their contract to purchase the business, and alleging, *inter alia*, tortious interference with business relationships, accountant malpractice, and conversion of personal property. (Compl., *Laethem v. Laethem*, R. 9-29, at 14–20.) When the parties reached a settlement in that lawsuit, they agreed as part of the terms of the settlement that Mark and Michael were fifty percent owners and shareholders of LEC and LFSC. According to Deere, Kathryn agreed to these settlement terms in order to avoid possible criminal charges in connection with her preparation of tax returns for LEC that reflected that Michael and Mark were owners of the company. In Deere's view, the settlement "revised a decade of history, and transformed the fraudulent tax returns into 'accurate' reports beyond criminal reach." (Deere Br. 19–20.)

Michael and Mark then filed a lawsuit in state court against J & D Implement, which alleged, among other things, conversion, interference with contractual relationships, and interference with business advantage. (Second Am. Compl., *Laethem Equipment Co. v. J & D Implement, Inc.*, R.

26–7.) Michael and Mark also filed a lawsuit in state court against Currie Kendall, PLC, in which they alleged the law firm acted as an agent of Kathryn Laethem and committed professional negligence and breached fiduciary responsibility. (Compl., *Laethem Equipment Co. v. Currie Kendall P.L.C.*, R. 194-7.)

In this action against Deere, Plaintiffs-Appellees LEC, LFSC, Michael Laethem and Mark Laethem allege Deere terminated their dealership agreements without providing notice of its intent to terminate, in violation of Michigan's Farm and Utility Equipment Act (MFUEA) (count I); Deere breached its contract by improperly terminating its dealership agreements and failing to properly maintain LEC and LFSC accounts (count II); Deere tortiously interfered with LEC's and LFSC's business relationships with their clientele by improper means, including theft of trade secrets (count III); Mark and Michael allege tortious interference with their business relationship with LEC and LFSC (count IV); LEC and LFSC allege Deere violated Michigan's Uniform Trade Secrets Act (count V); LEC, LFSC, Mark, and Michael allege Deere aided and abetted Kathryn Laethem's violation of fiduciary duty (count VI); and LEC and LFSC allege Deere violated Michigan's Franchise Investment Law (count VII). After a trial, the jury returned a verdict for LEC and LFSC on counts 1, 2, and 3, and Michael and Mark on count 4, and awarded damages of approximately $3.7 million to LEC, $1.7 million to LFSC, $271,000 to Michael, and $268,000 to Mark. This appeal followed.

## II. Kathryn Laethem and the Trust as Required Parties

Deere's first claim on appeal is that Kathryn Laethem and the Trust are indispensable parties whose absence required the district court to dismiss the action under Federal Rule of Civil Procedure 19(b).

We review *de novo* the question whether a party is indispensable under Rule 19(b), and whether the district court therefore lacks subject-matter jurisdiction. *Glancy v. Taubman Centers, Inc.*, 373 F.3d 656, 665–66 (6th Cir. 2004). However, the question whether a party is necessary under Rule 19(a) is reviewed for abuse of discretion. *Id.* at 666 (citing *Keeweenaw Bay Indian Cmty. v. Michigan*, 11 F.3d 1341, 1346 (6th Cir. 1993)).

We use a three-part test to determine whether a party is indispensable under Rule 19. "First, the court must determine whether the person or entity is a necessary party under Rule 19(a)." *Glancy*, 373 F.3d at 666. "Second, if the person or entity is a necessary party, the court must then decide if joinder of that person or entity will deprive the court of subject matter jurisdiction." *Id.* "Third, if joinder is not feasible because it will eliminate the court's ability to hear the case, the court must analyze the Rule 19(b) factors to determine whether the court should in equity and good conscience dismiss the case because the absentee is indispensable." *Id.* (citation and internal quotation marks omitted). Thus, a person or entity "is only indispensable, within the meaning of Rule 19, if (1) it is necessary, (2) its joinder cannot be effected, and (3) the court determines that it will dismiss the pending case rather than proceed in the case without the absentee." *Id.* (citing 4 Moore's Fed. Practice § 19.02[3][c], at 19-22).

A party is necessary under Rule 19 if either (1) in the party's absence, the court cannot accord complete relief among existing parties, Fed. R. Civ. P. 19(a)(1)(A), or (2) if the party claims an

interest relating to the subject of the action and disposing of the action in the party's absence may

(i) as a practical matter impair or impede the party's ability to protect the interest; or (ii) leave an

existing party subject to a substantial risk of incurring multiple or otherwise inconsistent obligations

because of the interest, Fed. R. Civ. P. 19(a)(1)(B).

Under the first alternative basis for required joinder, the question is whether Kathryn is a

necessary party because in her absence complete relief cannot be accorded among the parties. In a

suit against one joint tortfeasor, a judgment for monetary relief can be completely satisfied without

the presence of any other defendant. Accordingly, "[a] person's status as a joint tortfeasor does not

make that person a necessary party, much less an indispensable party." *Temple v. Synthes Corp.*, 498

U.S. 5, 7–8 (1990); *PaineWebber, Inc. v. Cohen*, 276 F.3d 197, 204 (6th Cir. 2001). Here, Plaintiffs-

Appellees brought a variety of contractual, tort, and statutory claims against Deere. The district court

found that Deere was seeking to join Kathryn as a possible tortfeasor to whom blame should be

assigned if any harm was done to Plaintiffs. Consequently, the district court denied the motion

because "being a joint tortfeasor simply isn't enough to trigger the application of Rule 19(a) and

require mandatory joinder."

Deere points out that Michigan eliminated joint-and-several liability in favor of several

liability in 1995. Today, a tortfeasor is liable only in proportion to its percentage of fault, and in

assessing percentages of fault, triers of fact are to consider the fault of non-parties as well as parties

to the action. *See* M.C.L. 600.2957; *Gerling Konzern Allgemaine Versicherungs AG v. Lawson*, 693

N.W.2d 149, 152 (Mich. 2005). Although this may suggest that Plaintiffs-Appellees cannot obtain

complete relief in tort in Kathryn's absence, it does not support the notion that Plaintiffs-Appellees' ability to obtain complete relief against Deere for *its* share of fault is at all limited.

Complete relief is determined as between persons already parties, "and not as between a party and the absent person whose joinder is sought." *School Dist. of Pontiac v. Secretary of U.S. Dept. of Educ.*, 584 F.3d 253, 265 (6th Cir. 2009) (citations omitted). Thus, because Plaintiffs-Appellees brought suit against only one severally-liable tortfeasor, Deere, the nonjoinder of Kathryn Laethem, to whom a percentage of the fault may be allocated, does not affect whether plaintiffs will be able to recover complete relief *as between themselves and Deere*. Accordingly, we conclude that complete relief can be accorded as between Plaintiffs-Appellees and Deere even in the absence of Kathryn Laethem as a named party.

A person may also be a necessary party under Rule 19 if he or she claims an interest relating to the subject of the action, and failing to join the person may either impair or impede the person's ability to protect the interest or leave the existing party subject to a substantial risk of incurring multiple or otherwise inconsistent obligations because of the interest. Fed. R. Civ. P. 19(a)(1)(B). Here, Deere does not argue that Kathryn Laethem claims an interest relating to the action. Deere does not assert that Kathryn may have claims against Deere in a separate action, and during the district court hearing on the Rule 19 motion, Deere acknowledged that any claims by the Trust or by Kathryn against Deere are probably barred by the statute of limitations. Nor does Deere argue that failing to join Kathryn would impede her ability to protect an interest or leave Deere subject to a substantial risk of incurring inconsistent obligations. Deere argues instead that nonjoinder "prejudiced Deere, particularly after the trial court failed to reduce the judgments in favor of LEC

and LFSC, based on the jury's allocation of fault to Kathryn." (Deere Br. at 27.) This suggests Deere is concerned about incurring damages for which Kathryn Laethem should be liable. But this argument goes to whether the district court properly calculated the damages owed by Deere, see Part III, *infra*, and does not establish that Deere faces a substantial risk of inconsistent or double obligations. Although Deere points to a variety of lawsuits in state and federal courts in which Plaintiffs-Appellees alleged "similar or the same causes of action," none of the other litigation is against Deere and thus cannot result in Deere incurring double or inconsistent obligations. Accordingly, the district court did not abuse its discretion in finding that neither Kathryn Laethem nor the Trust is a necessary party under Rule 19(a), and therefore neither party is indispensable under Rule 19(b).

### III. Reduction of Damages Award

Deere next argues that Michigan's comparative-fault scheme required that the award of damages for LEC and LFSC be reduced in proportion to the percentage of fault allocated to Kathryn Laethem by the jury.

A. Verdict Forms

The court prepared four verdict forms for the jury to determine whether Deere was liable to each of the four plaintiffs on the applicable counts. (*See* R. 475, 477, 479, 481.) The verdict forms for the corporate plaintiffs, LEC and LFSC, each contained nine questions. The first six questions corresponded to counts I, II, III, V, VI, and VII, and asked the jury to rule in favor of either plaintiffs or defendants on each of the counts. Question seven asked, "If you find in favor of the [plaintiff] in any of items 1, 2, 3, 5, or 6, above, state the following: We assess damages for the loss of net

asset value in the sum of $_____.'' (R. 477, 479.) Thus, question seven asked for one damages

assessment, without segregation, for violations of the MFUEA (count I), breach of contract (count

II), intentional and improper interference with business relationships (count III), aiding and abetting

Kathryn Laethem in breaching a fiduciary duty (count VI), and Michigan Franchise Investment Law

(count VII) claims. Question nine then asked the jury the following:

> If you found for the plaintiff in items 3 or 5 above [the tort counts], answer the
> following questions. Using 100 percent as the total fault that proximately caused the
> damage to [plaintiff], what is the percentage of the total fault of all persons that
> contributed to the damage, including each plaintiff and each person released from
> liability, regardless of whether the person was or could have been named as a party
> to the action, attributable to each of the following.

(*Id.*) The choices included, *inter alia*, each plaintiff, Deere, Kathryn Laethem, and the Trust. (*Id.*)

In its jury instructions, when the court explained to the jury how it must determine damages,

the court explained that "the kinds of damages that the Plaintiffs can recover are not the same for

each claim," (Trial Transcript ("Tr."), R. 497-19, at 3730), and instructed the jury that the

considerations that go into damages were different on each of the first three counts. However, in

each case, the damages nevertheless amounted to "loss of net asset value," with respect to both LEC

and LFSC, with potential subtractions if the jury were to find that plaintiffs could have prevented

some of the loss through reasonable care.[1]

---

[1]In explaining damages for the MFUEA claim, the court instructed the jury to "decide the amount of the Plaintiffs' damages based on the economic harm proximately caused by the Defendant's conduct. You should consider as the element of damages the loss of net asset value." (Tr., R. 497-19, at 3731.) In explaining calculation of damages on the breach of contract count, the court instructed the jury that "[t]he injured party should receive those damages naturally arising from the breach. . . . You should consider as elements of damages the loss of net asset value. In fixing the amount of damages, you should not include any loss that a Plaintiff could have prevented by

On their respective verdict forms, the jury found for LEC and LFSC on the MFUEA (count I), breach of contract (count II), and intentional and improper interference with business relationships or expectancies with customers, vendors, and manufacturers (count III) claims, and found for Deere on the remaining counts. The jury assessed damages in the amount of $3,740,000 for LEC and $1,665,000 for LFSC. In response to question nine, the jury allocated sixty-five percent of the blame to Deere and thirty-five percent of the blame to Kathryn Laethem. In the judgment, however, the district court ordered Deere to pay LEC and LFSC the full amount of the damages without reducing the amounts in proportion to the percentage of fault allocated by the jury to Kathryn Laethem.

During the hearing on Deere's motion to alter the judgment and for new trial, the district court explained that it entered judgment for LEC and LFSC in the full amount of the damages assessed without any reduction for the fault attributable to Kathryn Laethem because, "although a reduction would have been appropriate had the jury found liability under a tort count only or a count that was subject to the tort reform legislation, the jury also found liability under the breach of

exercising reasonable care and diligence when it learned or should have learned of the breach." (*Id.* at 3731–32.) Finally, in explaining calculation of damages on the intentional interference with business relationships count, the court instructed the jury that it must decide an amount of damages that "fairly, reasonably and adequately compensates the respective Plaintiff for each of the elements of damage you decide were proximately caused by the Defendant's conduct and that resulted from the Defendant's interference with that Plaintiff's business relationships or expectancies, taking into account the nature and extent of the harm." (*Id.* at 3732.) The court added that "[f]or damages based on economic harm, you should include each of the following elements of damage that you decide has been sustained by the respective Plaintiffs or that you decide those Plaintiffs are reasonably certain to sustain in the future: Loss of net asset value for Plaintiffs LEC or LFSC." (*Id.* at 3732–33.) No other elements were listed. Additionally, the jury was told not to "include any loss that a Plaintiff could have prevented by exercising reasonable care and diligence when it learned or should have learned of the breach." (*Id.* at 3733.)

contract count," a theory which is not subject to reduction for the fault of a non-party. The court added that because the tort reform statute deals only with allocation of responsibility for tortious conduct, "[t]he breach of contract count . . . is not subject to the defense that damages should be allocable." (Transcript of Hearing on Motion to Alter J., R. 505, at 48–49.)

## B. Waiver

Plaintiffs-Appellees argue that Deere waived its argument that the damages awards should be reduced in proportion to its degree of fault because it failed to request that the special verdict form provide for fault allocation on the breach of contract and MFUEA counts. The verdict form asked the jury to allocate percentages of fault to various parties and non-parties if it found for plaintiffs on the tort counts, but it only contained one assessment of damages. The form contained sufficient information for the parties to have anticipated and raised the issue of what would happen if the jury found for plaintiffs on both contract and tort theories, and requested clarification from the trial court in advance. However, nothing on the face of the verdict form provided that the trial court would refuse to proportionally reduce damages in such a scenario. Accordingly, Deere's failure to object to the form in advance of the verdict does not operate as waiver of the issue.

## C. Analysis

The question whether the Michigan comparative-fault scheme requires reduction of a damages award where damages are the result of liability in contract as well as tort is a legal question, and accordingly is reviewed *de novo*. *K & T Enters., Inc. v. Zurich Ins. Co.*, 97 F.3d 171, 176 (6th Cir. 1996).

After the enactment of tort reform legislation in 1995, Michigan law has followed a comparative-fault scheme of tort liability:

> In an action based on tort or another legal theory seeking damages for personal injury, property damage, or wrongful death, the liability of each person shall be allocated under this section by the trier of fact and, subject to section 6304, in direct proportion to the person's percentage of fault. In assessing percentages of fault under this subsection, the trier of fact shall consider the fault of each person, regardless of whether the person is, or could have been, named as a party to the action.

Mich. Comp. Laws § 600.2957(1) (2011).

The Michigan Supreme Court has stated that the legislation "eliminated joint and several liability in certain *tort* actions, requires that the fact-finder in such actions allocate fault among all responsible tortfeasors, and provides that each tortfeasor need not pay damages in an amount greater than his allocated percentage of fault." *Lawson*, 693 N.W.2d at 152 (emphasis added). Thus, there is no dispute that a reduction would have been warranted if the jury found Deere liable on only the tort theory.[2] Although Deere tries to argue otherwise, it is equally clear that the tort reform legislation does not apply to contract actions. *See Zahn v. Kroger Co. of Michigan*, 764 N.W.2d 207, 210 (Mich. 2009) ("We . . . hold that MCL 600.2956 [abolishing joint and several liability in actions 'based on tort or another legal theory seeking damages for personal injury, property damage, or wrongful death'] does not apply to contract actions"). Plaintiffs-Appellees argue merely that the tort reform legislation does not apply to contract actions. Neither party cites—and we could not

---

[2]In fact, the trial court reduced the award of damages with respect to individual Plaintiffs Michael and Mark Laethem based on the jury's determination that Kathryn Laethem was seventy-percent at fault for the tort of intentional and improper interference with the employment relationship between Michael and Mark Laethem and LEC and LFSC.

find—authority that governs whether the tort reform statutes require reduction of damages where, as here, the jury finds a defendant liable on contract as well as tort claims, and assesses damages representing a single indivisible injury arising out of both violations.

Deere argues that under the plain language of the tort reform statutes, which speak in mandatory terms, once the jury found Deere liable on a tort claim and made fault allocation findings, the trial court was required to reduce damages accordingly, and could not substitute its own decision not to allocate fault because Deere was also found liable for breach of contract. (Deere Reply Br. at 2 (citing Mich. Comp. Laws § 600.6304(3)).) However, under the statutory provisions' plain terms, such allocation and corresponding reduction in damages is only mandatory in actions "based on tort or another legal theory seeking damages for personal injury, property damage, or wrongful death." *See* Mich. Comp. Laws §§ 600.2957(1), 600.6304(1). The relevant inquiry, therefore, is whether the comparative fault statute is in the first place applicable where liability is premised on contract as well tort violations.

It is the duty of a federal court sitting in diversity to decide such unsettled questions of state law by attempting to ascertain from "all available data, including the decisional law of the state's lower courts, restatements of law, law review commentaries, and decisions from other jurisdictions," how the state's highest court would rule if faced with the issue. *See United Nat'l Ins. Co. v. SST Fitness Corp.*, 309 F.3d 914, 917 (6th Cir. 2002) (citation omitted).

One approach to resolving this issue is to determine whether the claims for which Deere was found liable, when considered as a whole, sound *primarily* in tort, or alternatively in contract, and to require the district court to reduce damages only in the former circumstance. The Iowa Supreme

Court apparently took this approach in two cases in which the jury found the defendant liable on both contract and negligence theories. In both cases the court upheld the application of comparative-fault principles after finding that the actions were essentially negligence actions for which the contract clause merely established the duty element. *See Kemin Indus., Inc. v. KPMG Peat Marwick LLP*, 578 N.W.2d 212, 221 (Iowa 1998) (upholding trial court's decision to set aside jury's breach of contract finding and basing judgment solely on negligence theory that allowed reduction of damages based on comparative fault, in action by manufacturer against accounting firm for failure to discover certain financial irregularities); *Long v. Jensen*, 522 N.W.2d 621, 623–24 (Iowa 1994) (upholding application of comparative-fault principles where defendant owner of town house breached contractual responsibility to make repairs, resulting in personal injury to plaintiff who fell on the defendant's property, and jury found the defendant liable on both contract and negligence theories).[3]

However, we believe there is a simpler approach to determine whether the jury award of damages should be reduced. The jury found Deere liable to the corporate Plaintiffs on three separate grounds, and the district court had instructed the jury that in the event it found Deere liable on any of those grounds, the damages should amount to the loss of net asset value for LEC and LFSC. One of the theories of liability was subject to Michigan's comparative fault statute, and if Deere had only been found liable on that claim, the damages would have been reduced in proportion to the jury's

---

[3]Application of the approach taken by the Iowa Supreme Court would not be as straightforward in this case, where the tort and contract claims do not arise from a single contractual breach. Instead, of the three counts for which Deere was found liable to LEC and LFSC, the common law breach-of-contract claim clearly sounds in contract, tortious interference with business relationships is clearly a tort claim, and the remaining count is a statutory claim under the MFUEA for improper termination of dealership agreements.

fault allocation. But the award of damages for loss of net asset value was also supported by two additional theories of liability—the breach of contract claim and the MFUEA claim—either of which was adequate grounds to support Plaintiffs-Appellees' recovery of the full amount of damages assessed without any reduction of fault to Kathryn Laethem. Accordingly, we conclude that the trial court did not err in refusing to reduce the jury's award of damages.

## IV. Election of Remedies

Deere also urges reversal on the basis that Section 5 of the MFUEA required LEC and LFSC to make an election of remedies between their breach of contract and MFUEA claims. Because they made no election, and because the verdict forms included only one damages computation for the corporate Plaintiffs, Deere argues it is impossible to determine whether the jury improperly awarded damages for both claims, or the extent to which damages for each claim contributed to the total amount.

Section 5 of the MFUEA states:

(1) The provisions of this act are supplemental to any agreement between the dealer and the supplier governing the return of inventory and the dealer may elect to pursue either a contract remedy or the remedy provided in this act. With respect to a dealer located in this state, a remedy provided for in this act shall not be limited by any agreement or contract between a supplier and a dealer.

(2) An election by the dealer to pursue a contract remedy does not bar the right of the dealer to the remedy provided in this act as to that inventory not affected by pursuit of the contract remedy.

(3) Notwithstanding anything contained in this act, the rights of a supplier to charge back to the dealer's account amounts previously paid or credited as a discount incident to the dealer's purchase of the inventory repurchased shall not be affected.

Mich. Comp. Laws § 445.1455.

Deere argues that the clear and unambiguous language of this provision requires LEC and LFSC to elect to recover either on their breach of contract claim or their MFUEA claim, but not both. No case has analyzed this provision, and Deere does not explain which words in this provision create the obligation it asserts. Subsection 1 provides that the dealer *may* elect to pursue either a contract remedy or the remedy provided in the act. Thus, the language of the subsection is permissive. That subsection also clarifies that the statutory remedy is *supplemental to* any contractual remedies available to the dealer, and shall not be limited by contract. Subsection 2 also does not generally require a dealer to choose between its statutory claim and its breach of contract claim, but provides that a dealer's pursuit of a contract remedy does not bar its right to pursue a statutory remedy as to inventory not affected by the contract remedy. Thus, the subsection does not affirmatively require an election between recovery under the statute or under the contract.

We agree with Plaintiffs-Appellees that, to the extent this provision requires an election of remedies, its purpose is to protect against double recovery. The MFUEA provides for two types of remedies: an inventory buy-back remedy requiring suppliers to repurchase inventory from dealers in accordance with the act, *see* Mich. Comp. Laws § 445.1453, 445.1454, and a common law breach-of-contract remedy. Once LEC and LFSC opted not to seek inventory buy-back, and instead sought recovery of the loss of asset value regardless of the claim under which they succeeded,[4] no further

---

[4]The verdict form developed by the district court in conjunction with the parties sought to have the jury determine liability as to the MFUEA and breach-of-contract counts, and then award the same damages for either count. In its jury instructions, the court gave similar but separate damages instructions as to each count. This could have confused the jury into believing it was coming up with separate damages for each claim. However, in both cases, the court instructed the jury to consider as the sole element of damages the loss of net asset value. And the relevant question

election was required. Accordingly, we find that the district court did not err in declining to require

LEC and LFSC to elect between their MFUEA and breach-of-contract claims.

## V.  Contract Clause

After Michael and Mark Laethem entered into dealership agreements with Deere, the

legislature amended the MFUEA to add Section 7a, which provides that a supplier "shall not

terminate . . . an agreement without good cause."  Mich. Comp. Laws § 445.1457a.  Deere argues

that the retroactive application of the good-cause termination requirement to the dealership

agreements violates the Contract Clauses of the United States and Michigan Constitutions.

We do not ordinarily decide constitutional issues when a case can be resolved on non-

constitutional grounds.  *Sistrunk v. City of Strongsville*, 99 F.3d 194, 197 (6th Cir. 1996).  Because

we conclude that the full award of damages to LEC and LFSC is supported under the breach-of-

contract claim, we need not reach Deere's Contract Clause claim.

## VI.  Set-Off

Lastly, Deere argues that the district court was required to grant a setoff from the judgment

against Deere for the amounts recovered by Plaintiffs-Appellees in their previous settlements against

J & D Implement and Kathryn Laethem and the Trust.

A.  Recoveries in Related Litigation.

---

on the verdict form simply asked the jury to "assess damages for the loss of net asset value" if it
found liability on *any* of several counts, which were listed in the disjunctive.  Nothing in the
instructions indicated that the jury should add up the damages that it found with respect to each
claim. Accordingly, Deere's claim that the jury could have awarded duplicative damages is not well
taken.

Mark and Michael Laethem commenced litigation against Kathryn Laethem and the Trust in state court in 2003. The complaint asked for specific performance of the contract with Michael and Mark Laethem for the purchase of LFSC and LEC, and alleged fraud, tortious interference with business relations, defamation and business disparagement, false light, conversion, and accountant malpractice. (*See* Compl., *Laethem v. Laethem*, R. 9-29, at 14–20.) As part of the settlement, it was acknowledged that Mark and Michael were the owners of LEC and LFSC, and that after $1.5 million was distributed to various entities and individuals, the balance of the cash in the accounts of LEC and LFSC would belong to those entities and be delivered along with various real estate to Mark and Michael Laethem. Deere valued the proceeds delivered to Mark and Michael Laethem as part of that settlement at approximately $2.4 million, which Plaintiffs-Appellees do not dispute.

The J & D Implement litigation was commenced by LEC, LFSC, and a related entity, Canusa Equipment Company ("Canusa"), in state court in 2005. The complaint alleged conversion, interference with a contractual relationship, interference with business advantage, misappropriation of trade secrets and confidential information as to all the plaintiffs, and fraudulent conveyance as to LEC. (Compl., *Laethem Equipment Co. v. J & D Implement, Inc.*, R. 500, Ex. 2.) The jury returned a verdict in November 2009, and awarded LEC a principal sum of more than $4 million on its conversion claim, which was trebled to more than $12 million under Mich. Comp. Laws § 600.2919a, which provides that a person injured by conversion may recover treble the actual damages sustained from the wrongdoer. LEC was also awarded more than $500,000 on its claim of intentional interference with business relations and $1.7 million of exemplary damages. LFSC was awarded a principal sum of approximately $1.25 million, which was trebled under Mich. Comp.

Laws § 600.2919a to $3.25 million. LFSC was also awarded more than $750,000 on its intentional interference with business relations claim and $1.7 million of exemplary damages. Altogether, the amount awarded to LFSC and LEC was greater than $20.6 million. Canusa was awarded a principal sum of more than $15,000, which was also trebled. A few months later, while post-trial motions were pending, the parties agreed to a settlement whereby J & D Implement would pay LEC, LFSC, Canusa, Mark, and Michael $5 million within thirty days, and the plaintiffs would release J & D from all claims. The Settlement Agreement specified that it was not to be construed as a release of any claims that the plaintiffs or Mark and Michael Laethem have against Deere.

    B. Analysis

    A trial court's decision regarding whether to grant a setoff is a matter in equity, which is subject to *de novo* review. *See Walker v. Farmers Ins. Exchange*, 572 N.W.2d 17, 19 (Mich. App. 1997).

    State substantive law applies to setoff claims. *BP Exploration & Oil Co. v. Maintenance Servs., Inc.*, 313 F.3d 936 (6th Cir. 2002) (applying state law of Ohio to determine whether district court erred in refusing to deduct from the award of damages an amount received in a prior settlement). Entitlement to a setoff is an affirmative defense that must be pled and proven by the party asserting it. *First Nat. Bank of Louisville v. Hurricane Elkhorn Coal Corp. II*, 763 F.2d 188, 190 (6th Cir. 1985). As a general rule, Michigan law allows only one recovery for a single injury. *See Great Northern Packaging, Inc. v. General Tire and Rubber Co.*, 399 N.W.2d 408, 410 (Mich. App. 1986). In order to avoid double recovery and yet properly compensate the plaintiff, where a plaintiff obtains a recovery for an injury that is identical in nature, time, and place to an injury for

which the plaintiff has already recovered, the first recovery must be set off or deducted from the plaintiff's subsequent award. *See id.* Once the plaintiff has been made whole with respect to one injury, a trial court properly sets off additional recovery that would overcompensate the plaintiff. *See Grace v. Grace*, 655 N.W.2d 595, 602–03 (Mich. App. 2002).

The amount of setoff is determined by looking at the extent to which the first recovery duplicates the second. *See Great Northern Packaging, Inc.*, 399 N.W.2d at 412. To determine the extent to which the damages overlap, it is necessary to go beyond the theoretical damages sought and look at the actual damages sought and proved by the plaintiff in a particular case. *Id.*

In *Great Northern Packaging, Inc.*, a seller of specialty goods brought an action against its buyer and a competitor claiming that the buyer breached its contract and the competitor committed tortious interference with contract. The seller settled with the competitor for $13,000, and then secured a $112,000 jury verdict against the buyer. *Id.* at 409. The Michigan Court of Appeals affirmed the trial court's setoff of the full amount of the settlement from the second award of damages where the complaint and the plaintiff's interrogatories indicated that the plaintiff sought the same items of damages—economic damages of actual costs, lost business, and lost profits—against both the competitor and the buyer. *Id.* at 412.

In *Ortiz v. Travelers Ins. Co.*, the plaintiff sued Vernors, a ginger ale manufacturer, and the insurer of a grocery store, after being injured by an exploding bottle purchased at the store. 140 N.W.2d 791, 792 (Mich. App. 1966). The plaintiff received a verdict against Vernors for $35,000. *Id.* Before the judgment was entered, the plaintiff negotiated a settlement to enter a consent judgment for $25,000, which Vernors satisfied. *Id.* When the plaintiff later settled with the insurer

for $5,000 and the insurer argued that recovery of the $5,000 would give the plaintiff a double recovery, the court held otherwise, and noted that the insurer's argument incorrectly assumed that the plaintiff's full damages had been satisfied in the Vernors' litigation. *Id.* at 794. Noting that the $25,000 consent judgment was the result of a settlement rather than a verdict, the court found that, even "accept[ing] the $35,000 verdict of the Vernors' jury as the limit of the amount to which the plaintiff was entitled, he has not received full satisfaction." *Id.* at 795.

Here, the damages award represents the loss of net asset value of LEC and LFSC, and Michael and Mark Laethem's lost earnings and lost opportunity to earn interest on loans to LEC and LFSC. The $5 million settlement in the J & D Implement litigation was not allocated to specific types of damages. Deere argues that the full amount should therefore be set off from the Deere judgment. Alternatively, Deere argues that 83.34 percent of the total damages awarded in the J & D litigation prior to settlement, approximately $17.2 million, are attributable to loss of net asset value and intentional interference with business relations. Accordingly, Deere argues that the same proportion of the $5 million J & D settlement, or nearly $4,167,000, should be set off against the Deere judgment. As a third alternative, Deere asserts that it determined based on an item-by-item analysis of Plaintiffs' claimed damages that the total damages claimed against J & D Implement "for loss of the same identical assets as Plaintiffs sought against Deere" amounts to $4,244,800, and that this amount represents a duplication of damages that should be set off.

Deere's arguments assume that the full recovery to which Plaintiffs-Appellees are entitled is the amount awarded in the instant litigation, approximately $6 million, rather than the greater amount awarded in the verdict against J & D Implement. A jury determined in the J & D Implement

case that the plaintiffs were entitled to more than $20 million, which included statutory trebling of damage awards and exemplary damages. As the district court noted, *Ortiz* suggests that the $5 million settlement does not provide Plaintiffs-Appellees with full satisfaction of the damages to which they are entitled. Deere cites no authority for the proposition that, for purposes of preventing a double recovery, the court should look to the smaller of two verdicts as the amount of damages that would make plaintiffs whole.[5] Further, because the verdict in the J & D Implement litigation also included awards for statutory trebling of damage awards and exemplary damages, neither of which were awarded in the instant litigation, it is far from clear that the $5 million settlement paid only, or even primarily, for identical injuries to those in the instant litigation, such that the recoveries overlap.

Accordingly, we find that the district court did not err in refusing to set off from the judgment the amounts recovered by Plaintiffs-Appellees in the settlements in the Laethem family litigation and the J & D Implement litigation.

## VII. Conclusion

For the foregoing reasons, we **AFFIRM** the judgment of the district court.

---

[5]The plaintiffs in the J & D Implement litigation signed a satisfaction of judgment that acknowledged that the settlement satisfied the jury verdict in that case and that the judgment pursuant to the jury verdict "shall be held for naught." However, although that document acknowledged that Plaintiffs-Appellees would release J & D Implement from all claims, it did not altogether negate the jury verdict. Under *Ortiz,* the extent of a plaintiff's damages is not determined by the amount at which the parties decided to settle, because a settlement is "based upon a meeting of the minds of the litigants rather than the verdict of the jury." *Ortiz*, 140 N.W.2d at 794–95. The jury verdict, therefore, is the better measure of what constitutes a full recovery in the J & D Implement litigation, regardless of the subsequent terms of the settlement.